# DECISIONS

OF THE

## APPEALS COURT

OF

## MASSACHUSETTS

---

ADOPTION OF SERGE.[1]

No. 00-P-723.

Worcester. January 17, 2001. - June 21, 2001.

Present: RAPOZA, SMITH, & GILLERMAN, JJ.

*Adoption,* Dispensing with parent's consent. *Parent and Child,* Adoption, Dispensing with parent's consent to adoption. *Minor,* Adoption. *Evidence,* Child custody proceeding.

In a proceeding to dispense with parental consent to adoption, the record demonstrated clear and convincing evidence of the mother's present unfitness to care for her child and that the child's interests would best be served by proceeding with the adoption by his foster parents. [6-10]

PETITION filed in the Worcester Division of the Juvenile Court Department on January 15, 1998.

The case was heard by *Jan Lewis Najemy,* J.

---

[1]The name is fictitious.

*Warren M. Yanoff* for the mother.

*Stewart A. Engel* for the child.

*Adam Simms*, Assistant Attorney General, for Department of Social Services.

GILLERMAN, J. The mother has appealed from a decree of the Worcester Juvenile Court pursuant to G. L. c. 210, § 3, and G. L. c. 119, § 26, dispensing with her consent to the adoption of her son, Serge, by the foster parents with whom Serge has lived since shortly after he was born. At the time of trial in the fall of 1999, Serge was twenty-one months old. Serge's legal father (the man to whom the mother was married when Serge was born) voluntarily waived his rights to the child. The putative father has never seen Serge and has never been involved with him. The putative father did not appear at trial. His whereabouts are unknown.

The mother claims that much of the evidence of her unfitness was stale and did not demonstrate clearly and convincingly that she is currently an unfit parent. She claims, too, that her parental rights should not have been terminated because her drug abuse and addiction is a "disability" that is only temporary and that there was evidence, which she claims the judge largely ignored, showing her to be well on the road to recovery. The mother further claims that the Department of Social Services (DSS) did not do enough to help her reunite with Serge and that it did not make provision for adequate visitation with him or for an up-to-date, amended service plan after it had changed the goal in the case to adoption. Finally, the mother contends that there was no evidence to support the judge's conclusion that removing Serge from his present setting would cause him serious emotional harm.

Our review of the trial record and the judge's findings leads us to conclude that the mother's present unfitness was clearly and convincingly demonstrated and that Serge's interests would best be served by proceeding with the adoption by his foster parents.

1. *The evidence.* By the mother's own account, her problems with substance abuse and addiction commenced sometime in 1992 when she began abusing painkiller medication (Percoset) to cope with her own mother's terminal illness. Prior to 1992,

the evidence showed (and the judge found) that she had been "a good wife and mother" to her three older children.

Her abuse of painkillers, starting in 1992, progressed quickly to heroin and cocaine, which she had begun using by 1993. Her problems with addiction worsened. Her older, teenaged daughter told a court investigator that her mother would disappear from home for days, even weeks at a time, without explanation of where she was going or what she was doing. Her older three children would hear that she had been arrested and had been incarcerated. She stole from her children and husband; cleaned out their bank accounts; called them only when she wanted or needed something. From 1992 to 1997, she was arrested or charged with numerous drug offenses, larcenies (several by check), shoplifting, operating to endanger, and assault and battery with a dangerous weapon. She had also briefly been incarcerated several times.

During these same years, the mother attempted, without much success, to overcome her drug problem. For instance, she related to one DSS worker that she had lived for seven months at one time in "a sober house" but then had relapsed. In July, 1997, while pregnant with Serge, she was referred for drug treatment services to the Adcare and the Spectrum programs, but she did not cooperate with or engage in treatment or counseling. She was admitted to one in-patient facility in July, 1997, but left against medical advice after only a few days.

The mother continued to abuse heroin, cocaine, or alcohol during her pregnancy with Serge throughout 1997 even though she was on a supervised program of methadone maintenance at that time. Methadone alone was not sufficient; she "supplemented" the methadone with other drugs. She admitted that she had smoked cocaine the day before giving birth to Serge. Serge was born with opiates and cocaine in his system. When Serge was in the hospital nursery, the mother sometimes fell asleep holding him, but then denied that she had done so to hospital staff. At one point, she failed to visit him for a day and one-half without explanation.

DSS obtained custody of Serge and placed him with his present foster parents in January of 1998, eleven days after his birth. After being released from the hospital, the mother visited

him only once. Soon afterwards, her whereabouts became unknown for over two months to DSS and the court investigator. She did not visit Serge or attempt to contact him during that period.

In April, 1998, the mother resumed contact with DSS and signed a service plan aimed toward possible reunification with Serge. She was asked by DSS to participate in substance abuse treatment, parenting classes, and individual therapy and also to find suitable housing. However, she engaged in those services only intermittently and inconsistently.

By September of 1998, she had stopped participating in the Spectrum program; had stopped seeing various counselors almost as soon as she had commenced counseling with them; and had failed to complete the required parenting skills classes. In October, 1998, she reentered the Adcare program, but remained there for only two weeks.

Over this same period, April, 1998, to October, 1998, despite being in and out of treatment, she continued to use drugs. She had several "dirty" screens for alcohol, heroin, or cocaine during this period. Thus, the mother continued a pattern of resisting, refusing, or not productively utilizing services while at the same time continuing to use drugs. Her own admission was that she had been involved since 1994 with the Adcare program and hospital, had found the staff there helpful and supportive, yet had continued to use drugs "as late as 1998" despite that help. There were, however, some positive results during this same period. The mother held a job for much of the time, had a place to live, and visited Serge regularly as scheduled. She was "appropriate" during those visits and "show[ed] concern."

In early November, 1998, however, after attending a court hearing regarding her progress, the mother once again disappeared, breaking off all contact with DSS and Serge. Also around that time, she relapsed once again, this time with alcohol. The relapse occurred because, as she put it, "everything" was "overwhelming" to her: she had left her job; could not find another job; had given up her housing; and was still on probation and under court order to pay restitution for an earlier offense. With the mother's disappearance, DSS abandoned its

goal of reunification in favor of adoption.

The mother's whereabouts remained unknown to DSS, despite the DSS worker's efforts to contact her, until the following March when a social worker from the Massachusetts Correctional Institution for Women at Framingham (MCI, Framingham) called the mother's DSS social worker to inform her that the mother had been sent there the previous month. According to the mother, she had been ordered to MCI, Framingham, for one year, until February, 2000, for violating her probation.

DSS then resumed visits between her and Serge at MCI, Framingham, on a monthly basis (there had been several visits by the time trial commenced in September, 1999). When trial concluded in October, 1999, the mother had been in jail for eight months and had another four months to serve. Upon her anticipated release from custody, she expected to enter a drug halfway house and program which she believed would take at least six months and possibly a full year to complete. During that period, Serge would not be able to live with her. Thus, at the time of the trial, she would not have been available as a full-time parent for Serge for nearly another year, in addition to the twenty-one months since Serge's birth that she already had been unavailable to him as a parent.

During this twenty-one month period when the mother was unavailable as a caregiver, Serge had forged close emotional ties to his foster parents, as they had to him. Indeed, the mother allows that Serge's placement in this setting "seems appropriate." At the same time, the mother offered nothing specific to suggest how she could raise and provide for Serge if he were removed from that setting. The mother had no relatives to assist her; she was estranged from her husband and was not welcome to return to his home to live; she had no prospects for a job or housing.

In her testimony, the mother claimed that while in prison she had taken additional parenting classes and that she had engaged further in drug treatment and counseling. But evidence of this was lacking; the judge neither credited nor discredited the claims. While the mother was in prison, DSS apparently had little direct involvement with her other than to conduct and

supervise the monthly visits.

2. *The mother's claims.* The core of the mother's claim is that her drug abuse problem, which dated from 1993, was temporary in nature and that, by the time of trial, she had "addressed" that problem and was therefore fit to parent Serge. To be sure, she had intermittently engaged for several years in efforts to overcome her problem, but there was no indication that over time the relapses were occurring further and further apart, or that periods of sobriety were increasing in length. See SJC Standards on Substance Abuse (SJC Standards), standard XIII, commentary (1998).[2,3,4]

---

[2]The policy statement adopted by the Supreme Judicial Court on March 30, 1995, states, in part, as follows:

> "Every judge in the Commonwealth should attempt to identify and appropriately respond to the indication of substance abuse by any party appearing before him or her in a court of the Commonwealth, where substance abuse is a factor in behavior related to the case." SJC Standards at 4.

[3]Standard XIII and the commentary thereto discusses the concept of relapse in detail:

> "Relapse is a stalling or slowing of a person's recovery process, when a person's unmet needs lead to stress and recovery difficulties. Relapse is not an event, but a process, in which the stress keeps building and the person becomes increasingly isolated, confused, and overwhelmed. Without an intervention, the person will often return to substance abuse. Often a relapse means that a person has reached an impasse in his or her recovery, sometimes called a 'stuck point.' The processes of relapse and recovery are intimately related to one another. The process of relapse can be interrupted by making a needed intervention . . . which may resolve the person's recovery problems."

> . . . .

> Recovery is a lengthy process, and substance abuse cannot be 'cured' any more than other chronic disease, such as diabetes, hypertension, or asthma, can be cured. [Footnote omitted.] People can, however, be taught to manage their substance abuse by remaining abstinent and following recovery principles." SJC Standards at 28-29.

[4]We cite the SJC Standards solely as an expression of a nonevidentiary opinion of a committee of the Supreme Judicial Court which was "designed to enhance the judiciary's response to the impact of substance abuse on the courts of the Commonwealth." Policy statement at 4.

In fact, the evidence and findings failed to demonstrate any significant period of total, voluntary sobriety on her part between 1993, when her substance abuse problems began, and February, 1999, when she was incarcerated for one year and was then placed in a situation of, essentially, enforced sobriety. Up until that point, treatment had not worked; and there is nothing in the record to support a finding that treatment that she may have undergone while in prison would likely have produced any different result.

It is true that court-mandated (i.e., coerced) treatment can be as effective as voluntary treatment. See SJC Standards, introduction at 4 ("Court-mandated substance abuse treatment programs have been convincingly demonstrated to work"); Standard V, commentary at 11. So too, the fact that a parent may have suffered a relapse need not preclude a finding that treatment is effective and that the parent is becoming sufficiently competent to provide appropriate care to her child. However, more than a few months of sobriety in a prison, unaccompanied by proof of effective drug treatment while there, was required to establish convincingly that, on release, the mother would be able to maintain sobriety sufficiently to become a fit parent. Here, the mother's lengthy period of addiction was unmarked by persistent, serious or significant periods of sobriety.

The judge was bound to consider any evidence of recent positive gains, along with evidence of a likelihood of genuine improvement in the mother's situation. *Adoption of Paula*, 420 Mass. 716, 731 (1995). However, any prediction that the mother's situation would improve depended upon credible evidence rather than mere hypothesis or "faint hope." *Adoption of Inez*, 428 Mass. 717, 723 (1999). The judge was not bound to conclude that the mother's six year pattern of drug abuse and persistent, periodic relapse would change. The judge's refusal to do so is supported on the record. See *Adoption of Hugo*, 428 Mass. 219, 224 (1998) (unless clearly erroneous, we do not disturb the judge's findings), cert. denied sub nom. *Hugo P.* v. *George P.*, 526 U.S. 1034 (1999).

The mother's drug abuse problem was not without adverse effects upon her children, Serge included. Her own daughter

described the destructive effects that her mother's drug addiction problem had had upon the family.[5] Prior to becoming an addict, she was a "good parent"; afterwards she was not. Serge was born with toxic substances in his blood, and for substantial periods of his life, the mother was physically unavailable to serve as his caretaker. Over the course of Serge's twenty-one months of life as of the time of trial, the mother had been physically unavailable to him for at least fifteen months.[6] To that must be added the five months remaining on her sentence until February, 2000, and another six to twelve months when she expected to be in a halfway house. Compare *Adoption of Katharine*, 42 Mass. App. Ct. 25, 33-34 (1997). Physical unavailability of the parent to provide day to day care for the child, including for reasons of incarceration, was relevant evidence of unfitness. See *Adoption of Nicole*, 40 Mass. App. Ct. 259, 261 (1996); G. L. c. 210, § 3(c)(xiii). See also *Adoption of Mario*, 43 Mass. App. Ct. 767, 771 (1997) (failure of mother to visit child or to contact DSS for over two months contributed to determination of unfitness). The mother's lack of meaningful participation in recommended services was also relevant to the question of her fitness. See *ibid.*

Overall, the mother did not appear able to offer a specific or realistic plan for assuming full time care of Serge. Her "plan" began at some uncertain time in the future when she might become available to care for Serge. Cf. *Adoption of Mary*, 414 Mass. 705, 710 (1993) (judge must evaluate whether parent is able to assume the responsibilities required of a parent). Given, too, the child's positive adjustment and close attachment to his present caretakers, the judge could properly determine, as she did, that the mother was currently unfit to parent Serge, was likely to remain so for the immediate future, and that adoption

---

[5]The mother acknowledged this as well. She testified, "I did a lot of damage that's going to take probably the rest of my life to fix. . . . I did a lot of bad things."

[6]From January, 1998, until April, 1998, when her whereabouts was unknown; from November, 1998, until February, 1999, when her whereabouts again were unknown; and from February, 1999, until the time of trial in September, 1999, when she was in prison.

of Serge by his foster parents served his best interest. See *Adoption of Nicole*, 40 Mass. App. Ct. at 262-263 (bond between child and foster parent "is a factor that has weight in the ultimate balance").

The mother next claims that DSS's efforts to assist her were insufficient. We conclude otherwise. Services were offered or recommended to the mother in at least two DSS service plans, the first one starting in April, 1998, and the second one starting in September, 1998, and running through March, 1999. The evidence showed that the mother had not participated consistently in the various services that DSS had recommended or provided and also that, for two extended periods of time, she was not even available to work with DSS.

DSS's obligation to work with the mother was contingent upon her own obligation to fulfill various parental responsibilities, including seeking and utilizing appropriate services and maintaining regular contact with DSS and Serge. See *Adoption of Mario*, 43 Mass. App. Ct. at 774. Any obligation on DSS's part to provide supportive services aimed at reunification, including offering expanded visitation rights as the mother had requested, ended once DSS had charted adoption as its goal. See *Adoption of Adam*, 23 Mass. App. Ct. 922, 924-925 (1986); *Adoption of Nicole*, 40 Mass. App. Ct. at 263.

Finally, the mother contends that there is no evidence to support the judge's finding that the forced removal of Serge from his foster family would cause him serious emotional harm. See G. L. c. 210, § 3(c)(vii). Though there was no direct evidence that the removal of Serge from the only home he has ever known would cause him harm, there was evidence of his strong bonds to his foster family. The judge's finding that Serge was "well integrated into [his foster] family" and that "[b]oth parents are affectionate with him and he with them" is fully supported by the evidence. The mother admitted that "it [would] not be easy for [Serge] to live with [her]" and that Serge "[would] miss [his foster] family." These findings, in conjunction with the mother's inability to meet Serge's needs, are sufficient to uphold

the judge's decision dispensing with the mother's consent to Serge's adoption. The decree dispensing with parental consent is affirmed.[7]

*Decree affirmed.*

---

[7]We affirm the decree solely on the basis of the record and the brief of DSS, without regard to the child's brief, to which the mother has objected.