After a trial, a judge of the Juvenile Court found the mother unfit to parent the child, terminated her parental rights, and approved the adoption plan of the Department of Children and Families (DCF).[3] On appeal, the mother claims the judge erred in finding her unfit and that certain procedural errors violated her due process rights. We affirm.
Background. The crux of this case centers on the mother's alcohol use disorder and resulting instability. The child was born in September, 2011. On December 16, 2011, the mother had a confrontation with a taxicab driver while holding the child. This led to police intervention and the hospitalization of the mother, in part, due to the mother's threats to hurt herself. DCF took custody of the child on the same day.
Over the course of the case's first year, the mother relapsed on more than three occasions. After the mother's fourth relapse, DCF changed the goal from reunification to adoption. In April and May of 2013, the mother filed three abuse of discretion motions seeking increased visitation, a referral for toxicology screens, and an order for clinical mediation and dyadic therapy.[4] The mother withdrew her motion for toxicology screens. After a two-day evidentiary hearing, the judge deferred ruling on the motions until after the trial.
The trial began in September of 2013 and continued for seventy nonconsecutive days, concluding in November, 2014. Thirty-nine witnesses testified and more than seventy exhibits were entered in evidence. The judge attributed the length of the trial to scheduling difficulties with multiple attorneys and a busy Juvenile Court session, witness availability, evidentiary disputes, and the need to conduct temporary custody hearings in unrelated new cases. On January 29, 2015, the judge decided that DCF had not met its burden, and ordered the gradual transition of the child to the mother and dyadic therapy. The order was conditioned upon, among other things, the mother maintaining her sobriety.
In March, 2015, DCF sought to suspend the mother's visitation and reunification with the child based on information received from the mother's biological family. After a hearing, the judge denied DCF's request. In April, 2015, DCF filed a second motion to reopen the evidence and to stop the reunification process, based on information that the mother had arrived for an unsupervised visit with the child while intoxicated and that the mother's live-in partner, Adam Jones,[5] had obtained a stay-away order against her. After a two-day evidentiary hearing in May, 2015, at which the mother did not appear, the judge found that the mother was unfit, that her unfitness was likely to continue indefinitely, and that it was in the child's best interests for the mother's parental rights to be terminated. Written findings and rulings were issued on October 19, 2016.[6]
The mother's drinking. The mother had a difficult and volatile upbringing and suffered significant trauma as a child. The mother also had problems with alcohol prior to the child's birth. In May, 2009, and again in October, 2010, the mother was arrested for operating a motor vehicle under the influence of liquor (OUI). After completing alcohol education programs and a two-week inpatient program as a result of these arrests, the mother relapsed.
In February of 2011, while she was pregnant with the child, the mother became intoxicated and was involved in an altercation. The police were called and the mother had to be physically removed from the scene.[7] She was injured as a result of this incident and stopped drinking for eight weeks. In April, 2011, the mother resumed drinking and continued to drink throughout her pregnancy. She was hospitalized in September, 2011, for alcohol and emotional issues.
After the birth of the child, a mandated reporter filed a G. L. c. 119, § 51A, report (51A report) due to the mother's use of alcohol during her pregnancy. After a visit with the mother, DCF determined there were no concerns as the mother indicated she would not drink again and the child had not tested positive for alcohol at birth. However, the mother continued to drink. During a visit from her family, she was hospitalized for drinking and emotional issues. DCF received a second 51A report as a result of this incident and after an investigation, opened a case for a comprehensive assessment. Upon her release from the hospital, the mother resumed drinking.
The mother was also under the influence of alcohol when the child was removed from her custody on December 16, 2011. The mother and Jones had an argument at the grocery store. She took a taxicab to her apartment, but did not have money to pay the fare. The taxicab driver became angry and called the police. Upon their arrival, the police found the mother to be intoxicated, leaning against the taxicab, and holding the child, who was naked from the waist down despite a temperature of forty-four degrees. The police filed a 51A report and took the child to the hospital out of concern for her health and safety. The mother did not accompany the child to the hospital; instead she went to a restaurant and drank. DCF removed the child as a result of this incident. Later that night, when Jones informed the mother that the child was in DCF custody, she threatened to hurt herself and pulled out a knife from a block in the kitchen. The mother was involuntarily committed as a result.
The mother's service plan. After the child was removed and placed in foster care, the mother tried to achieve sobriety. On December 27, 2011, she reported to the social worker that she was attending Alcoholics Anonymous (AA) meetings, seeking treatment at the Cambridge Health Alliance, where she was undergoing toxicology screens, and beginning treatment with a therapist. On January 9, 2012, DCF provided the mother with the first of seven service plans. Less than one month later, the mother relapsed and was involuntarily committed due to suicidal ideation. Upon her release, the mother resumed drinking and was found unresponsive and intoxicated at a Dunkin' Donuts. She was brought to a hospital and discharged later that day.
Prior to the commencement of trial, the mother participated in a number of services but relapsed several more times. While a social worker discussed an inpatient treatment program with the mother, the mother sought outpatient treatment, from which she was discharged after twelve days for failing to cooperate with toxicology screens. Thereafter the mother restarted therapy and submitted to random toxicology screens. DCF referred the mother for a parenting evaluation, which was completed in October, 2012. The mother asked DCF for a psychological evaluation, which DCF did not provide; however, she was able obtain one on her own. During this same period, the mother's unsupervised visits were increased and the goal of reunification remained. However, as reunification drew closer, the mother relapsed. She was found intoxicated in a coffee shop and was taken to a hospital where she admitted to drinking daily. Two days later, at a scheduled, unsupervised visit, the social worker detected an odor of alcohol from the mother, but the mother denied drinking. Two days thereafter, the mother left the social worker a voice mail message admitting to drinking due to the stress of the parenting evaluation. DCF reduced the mother's visitation and she relapsed again in December of 2012. Shortly thereafter, the mother was hospitalized where she was treated for depression, anxiety, and alcohol detoxification. At this time, DCF changed the goal from reunification to adoption and further reduced visitation. The mother then entered an outpatient program where she was treated for less than one week. She then completed a two-week program mandated by her OUI conviction. The day after she was discharged, the mother was found intoxicated at a restaurant, and was placed in protective custody. The mother was placed in protective custody two more times during the summer of 2013 and entered two additional treatment programs, neither of which she completed.
The mother's sobriety. One month prior to the commencement of trial, in August, 2013, the mother completed a stabilization program. She was transferred to a long-term residential treatment program, where she attended AA meetings, a parenting group, individual therapy, and group therapy. She also engaged in dyadic therapy with the child. The mother was discharged from the program in April, 2014, due to minor infractions, unrelated to alcohol; she was pregnant at the time with her second child.[8] She continued in therapy, had urine screens, and was able to maintain her sobriety for one year. As a result, the judge ordered longer and unsupervised visits with the goal of reunification.
The mother then relapsed. On April 8, 2015, the mother called the judge's lobby and admitted she had relapsed. The following month she left a message for her stepfather suggesting that she was considering suicide. Thereafter, the mother claimed she was seeking programs to assist her with alcohol use. However, the mother's housing was unstable; she had no regular contact with DCF; and her therapist discontinued therapy suggesting that the family needed someone more knowledgeable in the area of alcohol use disorder.
The mother's unfitness. "To terminate parental rights to a child and to dispense with parental consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the child's best interests." Adoption of Jacques, 82 Mass. App. Ct. 601, 606 (2012). As it is within the purview of the judge to weigh the evidence, assess the credibility of witnesses and, accordingly, make findings of fact, the judge's subsidiary findings will remain undisturbed unless shown to be clearly erroneous. Adoption of Nancy, 443 Mass. 512, 515 (2005).
Here, the judge issued comprehensive findings of fact and conclusions of law detailing the myriad factors supporting his decision. The judge properly considered the mother's history of alcohol use disorder, treatment, and relapse. See Adoption of Serge, 52 Mass. App. Ct. 1, 7 (2001). " '[A] condition which is reasonably likely to continue for a prolonged indeterminate period, such as alcohol or drug addiction ... [that] makes the parent ... unlikely to provide minimally acceptable care of the child' is not a temporary condition." Adoption of Elena, 446 Mass. 24, 31 (2006), quoting from G. L. c. 210, § 3(c )(xii). "A judge properly may consider a pattern of parental neglect or misconduct in determining future fitness and the likelihood of harm to the child." Id. at 33. "[P]ast [maternal] conduct [is] relevant to the issue of current parental fitness where that conduct was not too remote, especially where the evidence supported the continuing vitality of such conduct." Adoption of Larry, 434 Mass. 456, 469 (2001). A judge can "properly rely upon prior patterns of ongoing, repeated, serious parental neglect, abuse, and misconduct in determining current unfitness." Adoption of Diane, 400 Mass. 196, 204 (1987).
The mother does not dispute that she is unfit, nor does she challenge any of the judge's subsidiary findings. Rather she contends that delays in the trial and the conduct of DCF require a remand. We disagree. Preliminarily, the judge concluded that the evidence presented from September, 2013, through November, 2014, did not support DCF's position that the mother was unfit. However, as the reunification process moved forward, the mother relapsed and the judge concluded that her ongoing alcohol use disorder and the instability resulting therefrom rendered her unfit. Notably, the judge found that increased stress resulted in the mother's inability to remain sober, her instability with respect to her mental health,[9] and ultimately her inability to meet the child's needs. See Adoption of Frederick, 405 Mass. 1, 9 (1989) (parent's mental disorder relevant to extent it affects capacity to assume parental responsibility and deal with child's special needs). The judge's findings are amply supported by the record.[10]
DCF's efforts. The mother contends that DCF refused to provide services toward a goal of reunification, opposed her efforts to comply with service plan tasks, and single-mindedly pursued its goal of adoption. In part, the judge agreed. He found that "DCF did little to nothing to offer [the mother] services." To her credit, the mother found and engaged in services on her own; however, she was unable to maintain her sobriety for an extended period. While the manner in which DCF approached this case gives us pause, the child's best interests are paramount. See Adoption of Ilona, 459 Mass. 53, 61 (2011). It is because of her long-term struggle with alcohol use disorder that the judge ultimately terminated the mother's parental rights.
The mother also claims that DCF failed to make reasonable accommodations for her disabilities in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131 - 12134. Passing on the question whether the mother raised an ADA claim at trial,[11] the Supreme Judicial Court has held "that proceedings to terminate parental rights do not constitute 'services, programs, or activities' for the purposes of" the ADA, and that any claimed violations could not be used as a defense. Adoption of Gregory, 434 Mass. 117, 120-121 (2001). The mother asks us to overturn this holding, claiming Adoption of Gregory was wrongly decided. This we cannot do.
The mother's procedural claims. The mother claims that her due process rights were violated because of the length of the trial and the judge's delay in issuing findings. Specifically, the mother contends that these delays prevented her from reunifying with the child and prosecuting this appeal. It is true that an "extraordinary ... delay in custody proceedings ... could rise to the level of a violation of due process." Care & Protection of Martha, 407 Mass. 319, 330 (1990). Indeed, the judge noted that it was "beyond regrettable" that the trial took place over seventy days. However, there was a plethora of factors that contributed to this issue. These include disputes over evidence, the availability of witnesses and attorneys, and the court docket. The delays were frequent, somewhat expected, and outside the practical ability of the judge to control given the case volume and resource constraints of the Juvenile Court.[11] They were not attributable to any misconduct of any of the parties or the judge.
The mother has not shown how the delay prejudiced her; to the contrary, it appears that the delay, in some significant respects, worked in her favor. At the start of the trial, the mother had been sober for less than one week, and had not entered residential treatment. When the trial first concluded, the mother had been sober for fourteen months, and she had taken advantage of numerous supports to maintain her sobriety. Indeed, the judge found that DCF had not met its burden and ordered reunification between the mother and the child.[13]
The mother next claims that the delay in the issuance of the judge's findings of fact hindered her appellate rights. Juvenile Court judges should be expeditious in their rulings to prevent reliance on stale evidence and inaccuracies. See Adoption of Rhona, 57 Mass. App. Ct. 479, 485-486 (2003). Here, the judge announced his decision from the bench, there is no challenge to the accuracy of the findings, and the delay did not cause any actual prejudice to the mother.
Decree affirmed.

The father waived his right to a trial, and has not appealed from the entry of a decree terminating his parental rights.

Dyadic therapy is a form of attachment therapy that seeks to enhance the relationship between the child and a caregiver when there has been a disruption or a new connection.

A pseudonym. Jones is not the biological father of Yolane.

The judge made 1,124 findings of fact, and the decision encompasses 188 pages.

The mother was charged with assault and battery on a police officer.

The mother's second child was born in October, 2014, and is not involved in these proceedings.

The mother often threatened to hurt herself and was repeatedly hospitalized.

"We pause to note that the mother has shown evident affection toward [the child], and none of the judge's findings negate this. Despite the moral overtones of the statutory term 'unfit,' the judge's decision was not a moral judgment or a determination that the mother [does] not love the child. The inquiry instead is whether the [mother's] deficiencies or limitations 'place the child at serious risk of peril from abuse, neglect, or other activity harmful to the child.' " Adoption of Bianca, 91 Mass. App. Ct. 428, 432 n.8 (2017), quoting from Care & Protection of Bruce, 44 Mass. App. Ct. 758, 761 (1998).

The mother claims she raised the issue through an abuse of discretion motion. DCF claims it was not raised and therefore is not ripe for appellate review.

The mother also claims the trial delay prevented her from visiting with the child. However, the record demonstrates that the mother visited weekly for the vast majority of the time. Moreover, the judge acknowledged that the mother had a bond with the child, but that her alcohol use disorder and resultant instability warranted termination.