After a trial, a judge of the Juvenile Court found the mother unfit to parent her daughter, Ciara, terminated her parental rights, and approved the adoption plan of the Department of Children and Families (DCF).[3] Both the mother and Ciara appeal. They claim that the judge erred in finding the mother unfit and in terminating her parental rights. In addition, the mother claims that DCF failed to use reasonable efforts to reunify her with Ciara; Ciara claims that the judge abused her discretion in failing to order preadoption, posttermination visitation and ordering only quarterly postadoption visitation.[4] We affirm.
1. Background. The crux of this case centers on the mother's struggle with addiction. The mother began smoking marijuana and experimenting with other drugs in her teenage years. Her substance use continued into her twenties, and included alcohol, cocaine, OxyContin, and Percocet. Despite her struggle, the mother was able to work and was eventually promoted to a supervisory role. After she began to use heroin, she was involuntary committed, pursuant to G. L. c. 123, § 35. Thereafter, she maintained her sobriety for a period of time, relapsing when her boy friend ended their relationship. During this time, the mother became pregnant, and Ciara was born in August, 2011. A mandated reporter filed a report with DCF, pursuant to G. L. c. 119, § 51A (51A report), as the mother tested positive for opiates and marijuana the day before Ciara was born.[5]
In September, 2011, and January, 2012, DCF received two additional 51A reports alleging that the mother was using heroin and shoplifting. DCF continued to work with the mother to achieve and maintain her sobriety. Additional 51A reports were filed alleging that she continued to use drugs and to shoplift. By the fall of 2012, the mother had gone three months without treatment.
On May 23, 2013, a Randolph police officer filed a 51A report after Ciara was found wandering on a busy street, with no shoes, dressed in a "onesie," and with a feces-filled diaper. A care and protection petition was filed and DCF received temporary custody of Ciara. Some time thereafter, the mother overdosed on a prescription medication. After receiving emergency treatment, she entered an inpatient program, but left to join her then boy friend at a sober living program.
Overall, the mother's compliance with her service plan tasks was inconsistent. At varying times, she failed to follow through with outpatient treatment. She did not participate in any treatment and missed three weekly visits with Ciara in the summer of 2013. By the fall of 2013, the mother left inpatient treatment without completing the program. She relapsed again in July, 2014, and by her own admission, did not actively engage in treatment. At a visit with Ciara on August 5, 2014, the mother appeared to be under the influence; she entered a treatment program the next day. After seven months, the mother was terminated from the program for rule violations.
In March of 2015, DCF attempted to reunify the mother with Ciara. In May, 2015, the mother entered the Orchard Street Program, a residential treatment program where she could live with Ciara.[6] A transition plan was created with the input of Ciara's treatment providers. The mother raised no concerns about the plan at the time. Ciara remained with her mother at the program for one month. The mother struggled to manage her own treatment and care for Ciara. On July 28, 2015, the program filed a 51A report after the mother admitted to using controlled pain medication, without a prescription, over the previous month. Within a day, Ciara was removed from the mother's care.
2. The mother's unfitness. "To terminate parental rights to a child and to dispense with parental consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the child's best interests." Adoption of Jacques, 82 Mass. App. Ct. 601, 606 (2012). As it is within the purview of the judge to weigh the evidence, assess the credibility of witnesses and, accordingly, make findings of fact, the judge's subsidiary findings will remain undisturbed unless shown to be clearly erroneous. Adoption of Nancy, 443 Mass. 512, 515 (2005).
Here, the judge issued comprehensive findings of fact and conclusions of law detailing the myriad factors supporting her decision.[7] The judge properly considered the mother's history of substance use, treatment, and relapse, as well as its impact on the child. See Adoption of Serge, 52 Mass. App. Ct. 1, 7 (2001). "Evidence of alcohol or drug abuse is ... relevant to a parent's willingness, competence, and availability to provide care." Adoption of Anton, 72 Mass. App. Ct. 667, 676 (2008). " '[A] condition which is reasonably likely to continue for a prolonged indeterminate period, such as alcohol or drug addiction ... [that] makes the parent ... unlikely to provide minimally acceptable care of the child' is not a temporary condition." Adoption of Elena, 446 Mass. 24, 31 (2006), quoting from G. L. c. 210, § 3(c )(xii).
"A judge properly may consider a pattern of parental neglect or misconduct in determining future fitness and the likelihood of harm to the child." Id. at 33. "[P]ast parental conduct [is] relevant to the issue of current parental fitness where that conduct was not too remote, especially where the evidence supported the continuing vitality of such conduct." Adoption of Larry, 434 Mass. 456, 469 (2001). A judge can "properly rely upon prior patterns of ongoing, repeated, serious parental neglect, abuse, and misconduct in determining current unfitness." Adoption of Diane, 400 Mass. 196, 204 (1987).
Ciara has been residing with the same foster family throughout these proceedings, and they have been identified as the preadoption resource. When Ciara first entered foster care, she exhibited significant behavioral problems, including head banging and temper tantrums.[8] She is diagnosed with an adjustment disorder with disturbance of conduct and "R/O" posttraumatic stress disorder. In foster care, Ciara has made progress, and she continues to work with a therapist. See Adoption of Frederick, 405 Mass. 1, 9 (1989) (parent's mental disorder relevant to extent it affects "capacity to assume parental responsibility" and "deal with a child's special needs"). The judge's findings as to the mother's fitness and the resultant neglect of Ciara are amply supported by the record.
3. DCF's reasonable efforts. The mother contends that DCF failed to make reasonable efforts to reunify her with Ciara. She did not, however, raise this claim in the Juvenile Court. "It is well-established that a parent must raise a claim of inadequate services in a timely manner." Adoption of Daisy, 77 Mass. App. Ct. 768, 781 (2010). See Adoption of Gregory, 434 Mass. 117, 124 (2001). While the fact that the mother was not assigned a social worker at the time of the child's transition to her gives us pause, the child's best interests remain paramount. "[T]he proper focus of termination proceedings is the welfare of the child." Adoption of Ilona, 459 Mass. 53, 61 (2011), quoting from Adoption of Gregory, supra at 121. Even assuming that DCF failed to make reasonable efforts to reunify the mother and Ciara, it is because of her long-term struggle with heroin and other drugs that the judge ultimately terminated the mother's parental rights. There was no error.
4. Visitation. Ciara claims that the judge erred in providing for a minimum of four postadoption visits per year and failing to provide for visits posttermination and preadoption.[9] "Once it is established that a parent is unfit, the decision whether to grant postadoption [or posttermination] visits must be left to the sound discretion of the trial judge.... The judge's discretion is not, however, unfettered, but must be grounded in the over-all best interests of the child, based on emotional bonding and other circumstances of the actual personal relationship of the child and the biological parent, not in the rights of the biological parent nor the legal consequences of their natural relation." Adoption of Terrence, 57 Mass. App. Ct. 832, 839 (2003) (quotations omitted). Here, the judge considered Ciara's need for stability and consistency as well as her relationship with the mother. In ordering quarterly postadoption visitation, the judge recognized that Ciara enjoys a significant emotional bond with the mother. The judge also considered Ciara's strong and nurturing attachment to her preadoptive family. The judge's ultimate decision to order quarterly postadoption visitation was supported by the record and was not an abuse of discretion. See L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).
Decree affirmed.

The putative father died when the mother was six months pregnant.

At trial, Ciara argued that the mother's parental rights should be terminated.

Ciara was born with a low birth weight and remained in the hospital for nearly one week. Ciara was born drug free and showed no signs of withdrawal.

The mother tested positive for amphetamines on four tests in April, 2015.

Contrary to Ciara's argument, the judge did not fail to confront troublesome facts.

She had trouble sleeping and accepting limits and was unsafe at home and in day care.

Following entry of the decree, further hearings were conducted pursuant to G. L. c. 119, § 29B. The issue of posttermination visitation was addressed. Ciara did not object to the permanency plan, which included quarterly visitation posttermination. Accordingly, this aspect of Ciara's claim is moot.