Following a trial, a Juvenile Court judge concluded that the father was unfit to parent his children, and that termination of his parental rights was in the children's best interests.[3] In this appeal, the father principally claims that (1) the Department of Children and Families (DCF) failed to establish the father's unfitness by clear and convincing evidence, and (2) DCF did not provide him with adequate assistance to improve his parenting skills. We affirm.
Background. We summarize the judge's subsidiary findings of fact and conclusions of law,[4] which "are both specific and detailed, demonstrating, as we require, that close attention was given to the evidence." Adoption of Don, 435 Mass. 158, 165 (2001).
The mother suffered from cognitive impairment and had previously been treated for posttraumatic stress disorder and depression. Specifically, the judge found that the mother "[functioned] in the [m]ild [m]ental [r]etardation range of intelligence." In early 2011, the mother, the father, and their infant child (Orissa) moved from New Jersey to Springfield after the father was released from jail.[5] In April, 2012, the family entered a Springfield homeless shelter; a month later, Orissa and the mother transferred to a shelter in Attleboro. The father did not join them, as he had no identification. After the shelter staff observed that the mother had no income, health insurance, or identification (which left her unable to obtain Massachusetts benefits), a report alleging neglect of Orissa was filed pursuant to G. L. c. 119, § 51A (51A report), initiating DCF's involvement with the family; the 51A report was "screened-in." See 110 Code Mass. Regs. § 4.21 (2009).
The mother provided the father's first name and telephone number to DCF, but explained that he was not present. She also reported she was pregnant. In July, 2012, when DCF attempted to conduct an assessment of the family, they learned that the mother had left the Attleboro shelter with Orissa. The father subsequently contacted DCF and reported that they were living with him in Springfield, where he had obtained housing. An Attleboro DCF social worker created service plans for both parents, but was unable to contact the parents in Springfield.
One month after the mother and Orissa returned to Springfield, the father moved to Vermont. His stated intention was to find work to provide for his family, who remained in Springfield. The father had no stable housing in Vermont. He lived with friends, in shelters, or in motels. The father was unable to find steady employment. Meanwhile, the mother's and Orissa's precarious situation continued. They had no income, transportation, or stable housing. In November, 2012, these circumstances prompted a second 51A report to DCF, which was also screened-in.
The mother gave birth to Amy in December, 2012. Amy was born with congenital syphilis, a narrowing of the larynx, and an allergic reflux disorder. The father was not present at the birth. Two days later, DCF received another 51A report alleging neglect of both children, which was also screened-in. DCF then filed a petition to terminate the parents' rights, and was granted temporary custody of the children.
DCF created another service plan for the father. The plan required the father to (1) obtain identification, (2) obtain stable housing for the family, (3) work toward financial stability, (4) establish his paternity, and (5) regularly attend parent-child visits. The father, who had returned to Vermont, did not sign this service plan or meet regularly with his social worker. The father was homeless in Vermont, and only once participated in DCF's family assessment, missing or cancelling other appointments. He visited the children only once (in March, 2013) after they entered DCF care.
In May, 2013, the father was incarcerated in Vermont for possession of cocaine. After his release, he did not contact DCF to inquire about the children. In May, 2014, the father was arrested again in Vermont on charges of conspiracy to distribute cocaine and heroin. Ultimately, he pleaded guilty and was sentenced to ninety months in Federal prison. While incarcerated, the father did not contact DCF, even through his attorney, to whom DCF had provided all materials relevant to the ongoing case involving the family.
Discussion. 1. Termination of parental rights. "In deciding whether to terminate a parent's rights, a judge must determine whether there is clear and convincing evidence that the parent is unfit and, if the parent is unfit, whether the child's best interests will be served by terminating the legal relation between parent and child." Adoption of Ilona, 459 Mass. 53, 59 (2011). "[T]he critical question is whether the natural parent[ ] [is] currently fit to further the welfare and best interests of the child[ren]." Bezio v. Patenaude, 381 Mass. 563, 576 (1980). "We give substantial deference to a judge's decision ... and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Adoption of Ilona, supra.
The judge summarized her findings and conclusions as to the father as follows:
"[The] [f]ather, who is [the m]other's primary support, left the state while [the m]other was pregnant with the younger child, ... without a means to support or provide for herself and the older child. [He] has been in and out of jail over the course of the case, and is currently held in a [F]ederal prison on a term which will likely last at least 3 more years. [The f]ather ha[s not] maintained a relationship with the children, as several years have passed since [he] has seen [them]. The younger of the children has significant medical, developmental, and educational needs. Both children need a safe, stable, nurturing environment to grow up in. Neither parent is able to provide that."
We discern no abuse of discretion in her conclusion that this evidence clearly and convincingly demonstrated the father's parental unfitness. From the time the mother and Orissa first resided in a homeless shelter, the father was effectively absent from their lives. He provided no assistance while Orissa and the pregnant mother-whose "limitations" the judge found to be "obvious to all who interacted with her"-lived in a homeless shelter in Attleboro without identification, health care, insurance, or income. See G. L. c. 210, § 3(c )(vi, viii) (judge should consider unexcused failure to provide care and lack of effort in remedying conditions creating risk of harm to child as evidence of unfitness).
Once the father obtained temporary housing for his family in Springfield, he again left the mother alone to care for Orissa. While he was living with friends in Vermont, Orissa and the mother moved between homes (including one stay with an aunt described as a "functional crack addict" and without income or basic necessities. The father's inability to provide the children with some sort of financial stability, see Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption, 399 Mass. 279, 289 n.19 (1987), or a stable home life, Adoption of Quentin, 424 Mass. 882, 887 (1997), support the judge's conclusion that the father was unfit to parent the children.
The judge also properly found that the father's most recent felony convictions were likely to continue to deprive the children of a stable home. See G. L. c. 210, § 3(c )(xiii) ; Adoption of Nicole, 40 Mass. App. Ct. 259, 260-261 (1996). Moreover, the judge was entitled to conclude that the father's drug and weapons convictions constituted a pattern of illicit behavior demonstrating his unfitness to parent his children. See Care & Protection of Frank, 409 Mass. 492, 494-495 (1991). As to both the father's repeated criminal offenses and ongoing failure to support the children, the judge was "permitted to assess prognostic evidence derived from prior patterns of parental neglect or misconduct in determining future fitness and the likelihood of harm to the [children]." Adoption of Ilona, 459 Mass. at 60, quoting from Custody of Two Minors, 396 Mass. 610, 621 (1986).
Finally, the judge was justified in concluding that the father's failure to engage in services offered by DCF demonstrated his unfitness. See Care & Protection of Vieri, 92 Mass. App. Ct. 402, 405 (2017). Simply put, the judge acted within her broad discretion in concluding that the evidence clearly and convincingly demonstrated the father's unfitness.[6]
2. Adequacy of DCF services. The father claims that termination of his parental rights was error because DCF failed to "compl[y] with its duty to make 'reasonable efforts ... to prevent or eliminate the need for removal from the home.' " Adoption of Ilona, 459 Mass. at 61, quoting from G. L. c. 119, § 29C. Specifically, the father cites DCF's failure to contact him directly while imprisoned to arrange visits with the children. We are not persuaded. DCF's duty "was contingent upon [the father's] own obligation to fulfill various parental responsibilities, including seeking and utilizing appropriate services and maintaining regular contact with [DCF] and [the children]." Adoption of Serge, 52 Mass. App. Ct. 1, 9 (2001). Even prior to his incarceration, the father failed to fulfill his own parental obligations. When DCF created service plans for the father, he did not acknowledge or adhere to them. When DCF attempted to meet with the father, he repeatedly cancelled or missed those meetings. He saw the children infrequently and did not support them while he was away. On this record, we discern no failure by DCF warranting reversal.[7]
Decrees affirmed.

The mother, whose parental rights were also terminated after trial, is not a party to this appeal.

Despite the father's claims, we discern no error in the judge's findings and conclusions summarized here, as they are supported by "at least a fair preponderance of evidence." Adoption of Jacques, 82 Mass. App. Ct. 601, 606 (2012).

The father's adult criminal history to that point included felony convictions for theft and unlawful possession of a handgun, both resulting in periods of incarceration.

With one exception, we are not persuaded by the father's claims of error with the judge's factual findings. We agree with DCF that these complaints largely relate to how the judge weighed the evidence. The judge's weighing of the evidence and her credibility determinations are entitled to deference and we see no reason to disturb them here. See Adoption of Elena, 446 Mass. 24, 31 (2006). While the judge did err in finding that the father had the responsibility to inform DCF of how to reach him in Federal prison, that error was harmless in light of the ample other evidence of unfitness.

"Other points, relied on by the [father] but not discussed in this opinion, have not been overlooked. We find nothing in them that requires discussion." Commonwealth v. Domanski, 332 Mass. 66, 78 (1954).