NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

25-P-885

ADOPTION OF SHELBY.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

Following a trial in the Juvenile Court, a judge found the mother and the father unfit to parent their child, Shelby, and terminated their parental rights. On appeal, the mother argues that the judge relied on remote concerns that did not have a nexus to any harm to the child, he failed to consider her changed circumstances, and that certain findings of fact were not supported by the evidence. The father contends that the judge failed to consider his current engagement in treatment and sobriety and that termination of his rights was not in the child's best interests. We affirm.

1. Background. We summarize the facts as found by the judge, who issued comprehensive, detailed findings of fact and

_____

[1] A pseudonym.

conclusions of law.  In February 2022, the Department of

Children and Families (department) filed a care and protection

petition pursuant to G. L. c. 119, § 24, after the child was

born substance exposed.[2]  Both parents waived their rights to a

temporary custody hearing and the child remained in the

temporary custody of the department.  A trial was conducted over

eleven non-consecutive days in 2024.  In addition to the

parents, the witnesses included, among others, two department

social workers and Dr. Allison Bell, a psychologist retained by

the mother as an expert.  The mother also called her former

therapist as a witness in rebuttal.

    a.  The mother.  The mother was born in 1981.  As a child,

she was abused by family members.  When she was in High School,

the mother began using cocaine, mescaline, mushrooms, marijuana,

and alcohol.  At the age of nineteen or twenty, she became

involved with John (a pseudonym), the father of her four older

---

[2] A report pursuant to G. L. c. 119, § 51A (51A report) was
filed, alleging neglect by the mother.  The investigation
pursuant to G. L. c. 119, § 51B (51B investigation), supported
the allegations and the case was opened for services.  The
department's main concerns were the child's substance exposure
at birth, the father's long history of substance abuse, and the
mother's minimal prenatal care during the pregnancy, as well as
her long histories of substance abuse, lack of engagement with
department services, and termination of parental rights to her
other children.  The department was also concerned with the
parents' poor records of maintaining sobriety for extended
periods of time.

children.  The relationship was characterized by physical violence, control, and substance use.  During this relationship, the mother obtained six G. L. c. 209A restraining orders against John, and despite intervention by the department, the mother was unable to end the relationship and protect her children for nearly two decades.  In fact, the mother remained in contact with John and remained married to him until his death in 2020.

The mother's history with the criminal justice system spans twenty years.  From November 2002 until March 15, 2023, the mother was charged with multiple drug offenses involving the possession and sale of class A and class B controlled substances.  She also has been charged with operating a motor vehicle under the influence (OUI), larceny, conspiracy, and trafficking a controlled substance.

The mother's decades-long history with the department began in June 2003, when her first child was born substance exposed. Her second child, born in April 2007, also became involved with the department.  In October 2008, her parental rights were terminated as to the first two children.  Her third child was born in September 2013, substance exposed.  A report pursuant to G. L. c. 119, § 51A (51A report), was filed after the mother attempted to throw out the newborn's meconium sample before it could be tested, and the department took emergency custody.  The mother's parental rights to her third child were terminated in

3

May 2016.  Less than a month later, in June 2016, the mother gave birth to her fourth child while incarcerated.  This child also was born substance exposed, and a 51A report was filed alleging neglect by the parents.  The mother's parental rights as to the fourth child were eventually terminated as well.

The mother met the father after the death of John.  Their relationship formed around shared substance use.  The mother became pregnant with the subject child.  The mother and father lived together and used substances together during the pregnancy, during which the mother received minimal prenatal care.  She entered two treatment programs but continued to use cocaine and opiates.[3]

The mother is diagnosed with bipolar disorder, attention deficit hyperactivity disorder, post-traumatic stress disorder, obsessive compulsive disorder, anxiety, and depression.  She takes some medication.  She saw a therapist from October 2023 to May 2024 and began seeing a different therapist at the time of trial.

b.  The father.  The father was born in 1983.  He has a history with the criminal justice system.  The father was incarcerated out of state for approximately six years for a stolen motor vehicle charge that involved property damage.  In

_____

[3] The mother acknowledged that she probably used fentanyl at this time as well.

4

Massachusetts, the father was convicted of operating under the influence, leaving the scene of property damage, negligent operation of a motor vehicle, and operating after suspension. He was also arrested for shoplifting, receiving stolen property, and possession of a class A controlled substance.

The father began using substances in his youth, stopped in 2009, but had resumed using them around the time that he met the mother. In March 2020, he experienced an overdose that required three administrations of Narcan. The father and the mother decided to get sober together during her pregnancy with Shelby. He participated in three detoxification programs, and was living at one when the child was born. The father was asked to leave that program when Shelby was about two months old after an altercation with another resident. He completed an inpatient program in 2022, but returned to the mother, and they resumed using substances together.

c. The child. Shelby was born in February 2022 and tested positive for fentanyl and methadone. As noted, the department obtained temporary custody of the child and upon her release from the hospital, placed Shelby with her paternal aunt and the aunt's partner. The child is bonded to her foster parents; she gives them hugs, goes to them for assurance, and refers to them as "mama" and "dada." The foster parents are teaching her English and Spanish.

5

The foster parents kept the child up to date medically and ensured that she completed early intervention speech services.[4] The child sees a specialist for a lazy eye; anticipated corrective surgery was scheduled for May 2024. The child also participates in a play group to socialize with children her age. Dr. Bell, a psychologist retained by the mother, testified that there would be difficulty if the child were to be removed from her current placement, given the mother's difficulties with self-regulation and taking care of herself.

d. The period following the child's removal. After giving birth, the mother returned home and began using substances again. She was arrested on an outstanding warrant and incarcerated for about a month. Upon her release, she attended three substance abuse treatment programs, including a long-term program at which she stayed less than two weeks before leaving without telling her social worker. Although she entered additional programs, the mother continued to use substances and eventually left all treatment programs because she was "not ready" to become sober.

The department's referrals for the parents to receive in-home services were closed due to non-compliance. The mother did

_____

[4] Following removal and during the proceedings, the mother did not have contact with the kinship resource or with the child's medical providers.

6

not engage in domestic violence services, despite it being part of her action plan.  The mother and the father continued to use substances together until they were arrested in October 2022.

In October 2022, the mother and the father were arrested for drug trafficking (heroin and cocaine), following a long-term investigation by law enforcement.  After the mother and father were indicted on multiple charges of trafficking in controlled substances,[5]  the department changed the goal to adoption based on the parents' history of missed visits and lack of engagement.

Following the arrest, the mother committed to her recovery. After she was released from jail in June 2023, she went to a residential program, where she had a curfew and was required to consistently take her medication, attend scheduled groups, meet with a counselor, submit to random urine screens, and maintain her sobriety.  She began medication-assisted treatment, took classes to become an addiction counselor, got a job, and graduated from a program at Worcester State University, where she was the graduation speaker.  She also participated in domestic violence services and a parenting support group and completed domestic violence safety and relapse prevention plans.

---

[5] In November 2023, the father pleaded guilty and was sentenced to probation, with conditions including random urinalysis.  The mother was found guilty of both charges in May 2024 and received a one-year suspended sentence with six months of probation.

The mother planned to enter a residential program with the child, but the program required a reunification letter.  Neither of the two residential programs she applied to in the alternative allow children.

While incarcerated, the father completed an opioid treatment program and a cognitive behavioral therapy program.  He also completed a workplace skills training program.  Upon his release, the father temporarily lived with a friend before going to a thirty-day residential program.  From there he transitioned to another program before returning to the long-term program where he had been when Shelby was born, and where he remained throughout the trial.  He participated in treatment and consistently produced clean urine screens.  He attended four daily programs, group therapy, and individual therapy.  He has been taking methadone for five years.  The father completed a father's program and a relapse prevention plan but failed to provide evidence of the latter to his social worker.  He did not have a driver's license and was unemployed at the time of trial.  The father denies any mental health diagnoses or medications.  If returned to his care, the child would not be permitted to stay with the father at his current residential program.

e.  <u>The mother's parenting and psychological assessments</u>.  Dr. Bell completed a parenting assessment of the mother between November 2023 and January 2024.  Although Dr. Bell observed a

warm relationship between the mother and the child, she noted that the child became "noticeably disengaged" from the mother within a few minutes of the start of the visit. Dr. Bell observed that the mother was unattuned to the child and unable to recognize the cues and signals that the child was giving her. Dr. Bell testified that the mother moved from activity to activity with the child in a "somewhat pressured way," as if to "not just engage" the child but get her to "perform"; the child "was quite resistant to performing." Rather than taking a child-centered approach, and allowing the child to follow her own interests, the mother pulled the child from one activity to another and failed to respond to the signals that the child was giving to her. This raised questions for Dr. Bell about whose will and interests would take priority in the relationship. She anticipated that there would be difficulty if the child was removed from the kinship placement, and "[did not] believe that [the mother] developmentally has [the] ability to offer [the child] that level of caretaking that would be required" to take care of a child experiencing distress or anxiety from separating from her foster family.

Dr. Bell also testified that the mother historically reverted to substance use when she experienced duress. While the mother's recent recovery has been more successful than in the past, the length of her recovery was not "particularly

9

long."  Recovery from long-term substance abuse is extremely difficult and non-linear, and Dr. Bell testified that "[t]he true measure of [the durability of the mother's] change [will be] whether [she] can do the new behavior under duress."

The mother disagreed with Dr. Bell's assessment, and hired another psychologist, to review Dr. Bell's report.  The judge found that the testimony of the second psychologist, who did not examine the mother but only reviewed Dr. Bell's report,[6] was of minimal help and gave it little weight.

f.  <u>Visitation</u>.  The mother did not make herself available for visits during the 51B investigation; however, the father did.  The parents were given weekly visits once the case was opened for services.  The parents were inconsistent and attended approximately half of them.  On more than one occasion, they appeared to be under the influence.  The mother denied being under the influence and the father blamed any negative behaviors on his medication-assisted treatment.  On two separate occasions, the father was asked to leave a visit due to his behavior.  After they were incarcerated in 2022, the visits were monthly at the locations where the parents were held.

---

[6] While the second psychologist disagreed with Dr. Bell's methods and opinions, she testified that the mother has antisocial behavior and a tendency to act out.

10

The visits with the father were difficult after his release from jail as the child took a while to warm up to him and appeared nervous and shy. She cried, did not want to go to him, kicked at him, and pushed him away. The father needed a significant amount of redirection in interacting with the child. The mother testified that the child does not have a strong bond with the father and does not appear to know him.

2. Discussion. "To terminate parental rights to a child, the judge must find, by clear and convincing evidence, that the parent is unfit and that the child's 'best interests will be served by terminating the legal relation between parent and child.'" Adoption of Luc, 484 Mass. 139, 144 (2020), quoting Adoption of Ilona, 459 Mass. 53, 59 (2011). "We give substantial deference to the judge's findings of fact and decision, and will reverse only 'where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion.'" Id. That decision must also be supported by a finding "that the current parental unfitness is not a temporary condition." Adoption of Virgil, 93 Mass. App. Ct. 298, 301 (2018). Parental unfitness is "determined by taking into consideration a parent's character, temperament, conduct, and capacity to provide for the child in the same context with the child's particular needs, affections, and age." Adoption of Mary, 414 Mass. 705, 711 (1993).

11

a.  The mother.  The mother argues that the judge improperly relied on stale evidence about her substance use, speculated about the risk of harm reunification would present to the child, and discounted her evidence of changed circumstances.[7] Here, "[t]he evidence demonstrated that even before [the child's] birth, the mother's substance misuse had contributed to the removal of all four of her older children and had been a factor in her never having had any of those children in her care over a long term."  Adoption of Breck, 105 Mass. App. Ct. 652, 658 (2025).  She used substances during her pregnancy, and the child was born substance exposed.  See id.  The mother also continued to use substances after the child's birth, see id., because she was "not ready" to become sober.  See Adoption of Luc, 484 Mass. at 147 ("[P]arental rights should not be terminated only because the parent has a substance use

---

[7] The mother claims that "[t]he judgment terminating parental rights and finding unfitness must be reversed due to clearly erroneous key findings of fact," specifically that the finding that the mother was unable to understand and respond to the child's needs was "clear error" because it relied on Dr. Bell's opinion.  Ignoring the observations Dr. Bell made in support of her opinion, the mother argues that, based on testimony by a second psychologist, other "methodological" flaws render Dr. Bell's opinion not credible.  The judge specifically gave little weight to the second psychologist's testimony and, we discern no error in crediting Dr. Bell's opinion which was supported by her observations.  See Commonwealth v. Chism, 495 Mass. 358, 378 (2025) (expert may base opinion on "facts personally observed" [citation omitted]).

disorder," but "the parent's willingness to engage in treatment is an important consideration in an unfitness determination"). It was only after the mother was arrested for drug trafficking that her circumstances forced her to become clean.

While the mother made progress in her recovery by the time of the trial, her previous two decades of substance use (and attendant criminal activity) were "unmarked by persistent, serious or significant periods of sobriety," Adoption of Serge, 52 Mass. App. Ct. 1, 7 (2001), and this history contributed to the termination of her parental rights to her first four children.  In light of this, the judge was not obligated to conclude that her pattern would permanently change.  See id. ("The judge was not bound to conclude that the mother's six year pattern of drug abuse and persistent, periodic relapse would change").  We need not "wait for inevitable disaster to happen" and "may consider past conduct to predict future ability and performance."  Adoption of Katharine, 42 Mass. App. Ct. 25, 32-33 (1997).[8]

_____

[8] To the extent that the mother challenges the judge's characterization of her recovery as one buttressed by "guardrails," we are not persuaded.  It is a fair characterization of the evidence regarding the mother's substance treatment since her incarceration in October 2022. . That the mother's positive changes may have been "self-motivated," and "extended beyond mere compliance," does not change that they had not yet been tested outside of her supportive programs, nonetheless with the challenge of responding to the needs and demands of a young child.

13

Moreover, what is in the best interests of the child is "[a]t the core of the inquiry" of parental unfitness, Adoption of Katharine, 42 Mass. App. Ct. at 27, and Dr. Bell's assessments of the mother call into question her capacity to put the child's best interests ahead of her own, especially given her history and uncertain station in recovery.[9] The judge also found that the mother was inconsistent with her visits, and had difficulty engaging with the child and meeting her needs. The mother's demonstrated inability to respond appropriately to Shelby's cues reasonably cast doubt on the mother's ability to offer the level of caretaking required to successfully transition Shelby from her foster care placement where the judge found her needs are being fully and consistently met. There was no error.

b. The father. With respect to the father, this is a closer case. He argues that the judge erred in concluding that his history of substance use and criminal behavior rendered him unfit and likely to remain so indefinitely, and that terminating

---

[9] To the extent that the mother challenges the judge's findings regarding Dr. Bell's assessments as clearly erroneous, her arguments "amount to no more than a disagreement with the judge's weighing of the evidence and credibility determinations regarding witnesses," particularly where the second psychologist did not conduct her own evaluation. Adoption of Don, 435 Mass. 158, 166 (2001).

his parental rights was not in the child's best interests.[10]  He argues that the judge improperly discounted his sobriety and engagement with treatment since his incarceration in October 2022.[11]  Here the judge did not err in weighing the father's decades of substance use against the progress he had made since his most recent arrest.  See Adoption of Serge, 52 Mass. App. Ct. at 7; Adoption of Katharine, 42 Mass. App. Ct. at 32-33. The father's inconsistent visits with the child and his intoxication during visits also support the judge's determination.  See Adoption of Mario, 43 Mass. App. Ct. 767, 771 (1997) (failure of parent to visit child or contact department for over two months contributed to determination of unfitness).

Moreover, a parent's failure to benefit from services is "relevant to the determination of unfitness" (citation omitted). Adoption of Ulrich, 94 Mass. App. Ct. 668, 677 (2019).  Here, the judge found -- and the father does not dispute -- that while

_____

[10] At oral argument, the father argued for the first time that finding 149 was clearly erroneous.  Because this was not raised in his brief, we deem this argument waived.  See Gray, 423 Mass. at 296-297; Mass. R. A. P. 16 (a) (9) (A), as appearing in 481 Mass. 1628 (2019).

[11] To the extent that the father argues that the judge shifted the burden to the father to prove his fitness, we are not persuaded.  "The judge did not call on the [father] to prove anything.  He correctly stated the burden of proof in his conclusions of law."  Adoption of Larry, 434 Mass. 456, 470 (2001).

15

the father had utilized some services, he failed to benefit from them. "[M]ere participation in the services [recommended by the department] does not render a parent fit without evidence of appreciable improvement in [their] ability to meet the needs of the child[]" (quotation and citation omitted), id., and the judge was not obligated to conclude otherwise. While the judge acknowledged the father's love for Shelby, the judge found that the father had not bonded with the child and that the evidence did not show that he had the ability to parent Shelby through the upheaval that would come with raising a young child that had never been in his care.

While the father had made progress in his recovery by the time of the trial, "[t]he judge [was] not required to grant the father an indefinite opportunity for reform." Adoption of Cadence, 81 Mass. App. Ct. 162, 169 (2012). The judge was also not obliged to find that the father's pattern of relapse would change considering his history. See Adoption of Serge, 52 Mass. App. Ct. at 7. "Where there is evidence that a parent's unfitness is not temporary, the judge may properly determine that the child's welfare would be best served by ending all legal relations between the parent and child." Adoption of Cadence, supra. The child, now four years old, deserves safety, security, and permanency. See Adoption of Nancy, 443 Mass. 512, 517 (2005) ("Stability in the lives of children is important,

16

particularly in a case that has continued for a long period of time in the hope that the [parents] could and would successfully rehabilitate [themselves]").  Here, the judge found that the child was bonded to her foster parents and would likely experience psychological harm if separated from them.  The child lacks a meaningful bond with the father, whom she has neither lived with nor has ever been parented by.  In light of these findings, all of which find support in the record, there was no error.

Conclusion.  While the parents had attained commendable progress in their recovery by the start of the trial, we cannot say the judge erred in finding that the child remained at risk if returned to their care.  See Adoption of Ilona, 459 Mass. at 59-60 ("Even where a parent has participated in programs and services and demonstrated some improvement, we rely on the trial judge to weigh the evidence in order to determine whether there is a sufficient likelihood that the parent's unfitness is temporary"); Adoption of Katharine, 42 Mass. App. Ct. at 32-33

17

(judge may use parent's past conduct "to predict future ability and performance").

Decrees affirmed.

By the Court (Blake, C.J.,
   Vuono & Neyman, JJ.[12]),

*Paul Little*

Clerk

Entered:   April 8, 2026.

---

[12] The panelists are listed in order of seniority.