PETITION OF BOSTON CHILDREN'S SERVICE ASSOCIATION TO
DISPENSE WITH CONSENT TO ADOPTION.

Suffolk.    May 6, 1985. — August 12, 1985.

Present: GRANT, KASS, & FINE, JJ.

*Minor,* Custody. *Parent and Child,* Custody of minor. *Adoption,* Dispensing
with parent's consent.

In a proceeding to dispense with parents' consent to the adoption of their
six and one-half year old child, who had been placed in foster care when
approximately ten months old as the result of circumstances involving
the mother's incarceration following a murder conviction and the inability
of the father and the maternal grandmother to care for the child, the
requisite finding of the parents' current unfitness was not established by
clear and convincing evidence, where the judge's findings did not reflect
sufficient consideration of the parents', and particularly the father's,
abilities to care for the child. [571-574]

PETITION filed in the Suffolk Division of the Probate and
Family Court Department on July 21, 1981.

CIVIL ACTION commenced in the Suffolk Division of the
Probate and Family Court Department on November 9, 1982.

The cases were heard by *Robert L. Yasi,* J.

*Katherine Triantafillou* for the parents.

*R. Susan Dillard* for Boston Children's Service Association.

*Daniel M. Lewis* for the minor child.

KASS, J. Recent cases concerning termination of parental
rights have emphasized the gravity of separating children from
their biological parents. Fundamental rights and relationships
are involved. See *Freeman* v. *Chaplic,* 388 Mass. 398, 407-408
(1983); *Petitions of the Dept. of Social Servs. to Dispense with
Consent to Adoption,* 389 Mass. 793, 799-800 (1983); *Petition
of the Dept. of Social Servs. to Dispense with Consent to
Adoption,* 391 Mass. 113, 118-120 (1984); *Care & Protection
of Three Minors,* 392 Mass. 704, 711-712 (1984); *Petition of*

*Catholic Charitable Bureau to Dispense with Consent to Adoption*, 18 Mass. App. Ct. 656, 662 (1984), *S.C.*, 395 Mass. 180 (1985). See also *Santosky* v. *Kramer*, 455 U.S. 745, 759-770 (1982).

So it is that in proceedings under G. L. c. 210, § 3, to dispense with the consent of natural parents to adoption — such as the case at bar — there must be a showing of grievous shortcomings or handicaps on the part of the natural parents which place the child at serious hazard. *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. 631, 646 (1975). *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 391 Mass. at 118. Even where prospective adoptive foster parents have become a minor child's psychological parents (i.e., the child has bonded with them), there is no rule that these foster parents shall automatically prevail in a custody dispute over a natural parent. *Ibid.* Parents must be given ample opportunity to demonstrate an ability to provide proper care for the child. *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. at 646. The rights of the biological parents, however, are not absolute. Indeed, the paramount duty of courts is to consult the welfare of the child. *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 389 Mass. at 799. Neither the parental fitness test nor the best-interests-of-the-child test is to be applied to the exclusion of the other. *Petition of Catholic Charitable Bureau to Dispense with Consent to Adoption*, 395 Mass. at 184. Accordingly, whether a biological parent is currently fit to further the welfare of a child is to some degree a function of the needs of the child. *Petition of Catholic Charitable Bureau to Dispense with Consent to Adoption*, 18 Mass. App. Ct. at 661.

With the legal framework thus established, we turn to the facts of the instant case. Those we draw from the trial judge's findings with supplementation from the record. The appeal is from a decree, a judgment and five orders, but the focus of the appeal is on the decree allowing the petition of Boston

Children's Service Association to dispense with parental consent to adoption.[1]

Lisa (the mother) and Brian (the father), although not married, lived together and with their daughters as a family unit. An older daughter, Tanika, was born in 1977; a younger, Karla, was born December 11, 1978. On September 18, 1979, Lisa was involved in a criminal episode which led to her indictment for first degree murder. She became aware that a warrant had issued for her arrest, and in the second week of October, 1979, made plans to surrender to the police. Among the things for which Lisa had to plan was the care of her children. The arrangement she made was to place them in the care of her mother, i.e., the maternal grandmother, on or about October 10, 1979. Karla was then nine months old.

The father, both parents assumed, would not be able to give either of the children the care they needed. He worked; the children were in diapers; cousins could help the grandmother.

After her surrender Lisa was incarcerated in M.C.I., Framingham. Within a month, i.e., sometime in November, 1979, the maternal grandmother found she could not cope with the children and sought assistance from the petitioner, Boston Children's Service Association (the agency). The agency was unable to find a single foster home for Tanika and Karla and placed them in separate homes.

For Karla, the frequent change in caretakers was devastating. Her physical and intellectual development was normal, but her social and behavioral development was significantly below her age level. She was withdrawn, nonreacting, unsmiling. This was attributable to a failure to attach to any primary caretaker. By early 1980, when a psychiatrist, Dr. Margaret P. Gean, first examined Karla, the child had been in the care of four primary caretakers: the mother, a friend of the mother's (for about two weeks), the grandmother, and a foster home caretaker.

---

[1] The judgment dismissed the parents' complaint for custody of their daughter Karla. The five orders relate to visitation and procedural matters.

Through the good offices of the agency, biweekly visits were arranged at M.C.I., Framingham, between the children and their mother. There were also visits with the maternal grandmother. Beginning in the summer of 1980, after Lisa was admitted to bail, there were visits with both parents on something approximating a weekly schedule.

Those visits, Dr. Gean concluded in a second evaluation in early 1981, affected Karla adversely because they confused her as to who was her caretaker and impaired her ability to attach, i.e., to bond with an adult. Failure to bond by the age of three is highly likely to lead to lifelong psychological injury. By the time of the second evaluation, Karla's over-all development was about four months delayed, and she demonstrated serious lags in social, emotional and language development. On the basis of Dr. Gean's diagnosis and prognosis, the agency cut off visits between Karla and her parents in March, 1981. If Karla was to bond, it was best, the agency determined (in large measure on Dr. Gean's advice), that there be a clearly identifiable caretaker. The mother was awaiting trial on a capital offense, and her continued availability was uncertain. The father, who could not afford to maintain the family apartment on his income alone, had been peripatetic during the mother's imprisonment. As of March, 1981, the mother and father had not established a permanent home, though they did so in June, 1981. It followed that the foster mother would be the logical primary caretaker.

Even in the circumstances of an unambiguous placement, Karla failed to make a healthy attachment. It was necessary for the agency to provide the foster mother — who was an experienced foster mother — with professional assistance to enable her to meet Karla's peculiar psychological needs. The foster mother was taught that it was necessary to hold, hug and indulge Karla and talk baby talk to her more than one ordinarily would with a child of her age. At the time when the agency terminated contact between Karla and her biological parents, she was considered to be at serious risk so far as her mental health was concerned unless a strong attachment should be formed.

As to Tanika, the older daughter, who was different in personality and development, the agency took a different tack. It assisted the father in learning and performing the duties of the parent in charge. The father prepared meals, saw to it that Tanika was properly dressed and that she went off to school. He played with the child and read to her. The apartment in which he resided with the child was spacious. There were pictures, books, toys and furniture for the child. She and her father had a dog. Under the father's care, Tanika was well cared for and their relationship was a good one. They visited the mother at prison regularly. Taken all in all, Tanika, under her father's care, was a healthy and cheerful child.

Through the concentrated efforts of the foster mother, with support from agency professionals, Karla's mental health substantially improved. By December of 1981, she would dance, sing and smile, none of which she was wont to do before; she could differentiate between adults and would go to her foster mother for comfort. The agency and the foster mother had thus succeeded in making the attachment which Dr. Gean had prescribed for Karla. The agency's proposed adoption is with the foster mother, with whom the agency has had experience in the care of other foster children.

No effort had been made to achieve a similar bond between Karla and her father. At the critical period, the first three months of 1981, the agency regarded the father as more or less out of the picture and not a suitable candidate for the role of primary caretaker. That was before the father succeeded in establishing a home. Even when the father's situation had stabilized to the point that the agency was encouraged to place Tanika in his custody, it was the agency view that Karla required the special stability of her foster home placement. Karla needed close attention by a single caregiver and could not be entrusted to day care or babysitters. Apparently there was skepticism whether the father, who at that time was working full time,[2] could provide the relatively sophisticated child care

---

[2] The foster mother, a single parent who supported herself through babysitting, foster care and AFDC payments, was available at home all day.

techniques which had to be lavished upon Karla each day until she should overcome the effects of the earlier instability in her life, and whether he had demonstrated sufficient interest in planning and caring for Karla. The probate judge was moved in his findings to observe that the father was "at his limit now in caring for Tanika and continuing their relationship with mother; although sincere, he is 'slow', he does not have the capacity to deal with the intricate psychological problems facing Karla; he did not have the capacity to prevent Karla from detaching from the family."

As an absolute matter, it could hardly be said that the father, at the time of trial, was currently unfit. So far as Tanika was concerned, his capacity as a parent was well above the merely tolerable. The child had decent housing, clothing and food, mental stimulation and emotional support. If the father were to be found unfit then it would be in some relative sense as to Karla. Such seems to be the import of the judge's finding that the father had reached the limit of his capacity with the older child.

Yet the record is barren of any evidence that establishment of an attachment between the father and the younger child was ever attempted. By the time the father achieved stability, a few months after his visits with Karla had been halted, the agency appears to have regarded any alternative to Karla's permanent placement with the foster mother as out of the question.

In the short run, there may have been some psychological reasons for this. Karla required exceptional stability. But even the psychiatrist who had recommended steps to assure stability had not foreclosed the possibility and possible desirability of reestablished contact with her biological parents. She had even left open the possibility of continuing parental visits in 1981, if they could be held at the home of the foster mother. The foster mother, however, was unwilling to participate in such an arrangement.

The severance of all rights, duties and other legal consequences between parent and child is an extreme step. *Petition of the Dept. of Social Servs. to Dispense with Consent to*

*Adoption*, 391 Mass. at 119. That case is instructive. There, at the time of a mother's abandonment of her children, the father was in no position to take care of them. Later, when he formed a stable family unit with another woman, he sought reunification with them. One child had been placed as an infant with a foster family and had prospered. A great deal of time — almost ten years when the last appellate decision was rendered — had elapsed; the foster family was the only one the child had known. *Id.* at 114-116. The court held that the psychological attachment formed by the child with her foster family was an insufficient reason to preclude reunification of the child in question with her natural father. *Id.* at 119-122.

The instant case presents factors which argue even more powerfully against a present irreversible termination of parental rights. Here it cannot be said that the children were simply abandoned. The mother was placed in a position where she had to make arrangements for their care and did so with a close relative, her own mother. She made every effort to maintain contact with the children. The father here made efforts to reunite the family far sooner than the father in the previously cited case. The mother and father stayed in touch, even after the mother's imprisonment, brought proceedings to regain custody of their children and, of course, declined to consent to the adoption of Karla. These parents' temporary relinquishment of physical custody, as the result of a crisis that had no root in their relationship with the children, does not suggest any unwillingness or unfitness to resume custody when feasible. See *Bezio* v. *Patenaude*, 381 Mass. 563, 577 (1980).

Except for such impression as the judge might have been able to form from observing the father on the witness stand, there is nothing in the record to indicate that the father was slow, if by that term the judge meant that he possessed less than normal intelligence. Perhaps the father had little understanding of nuances of psychology, but there was not, as in some cases, a demonstrated resistance to instruction about a child's special needs. The agency's principal caseworker perceived no physical or mental deficiency and found that the father accepted direction and suggestions in working with

Tanika. Compare *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 18 Mass. App. Ct. 120, 125-126 (1984). A clinical psychologist who had observed the father with Tanika estimated his intelligence as "at least average" and described him as stable, caring and responsive to his daughter. Other witnesses found no occasion to comment about the father's mental abilities.

That the father was a competent parent to Tanika does not necessarily qualify him as a fit parent for a child whose circumstances and needs are markedly different. *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 389 Mass. at 799. Where one sibling is resilient and the other vulnerable, differentiation has been appropriate notwithstanding repeated previous personal crises on the part of the parent. See *Petition of Catholic Charitable Bureau to Dispense with Consent to Adoption,* 18 Mass. App. Ct. at 661. Such has not been the history in this case, where one crisis occurred and the father, with support from the agency and some from family, has demonstrated fitness. In these circumstances, we do not think there can be said to be clear and convincing evidence of unfitness as to Karla.

Whether the mother is unfit is to some degree a function of the fitness of the father. Incarceration of the mother does not conclusively render her unfit as a parent. *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adption,* 383 Mass. 573, 581-582 & n.7 (1981). If the father is available to care for the child or the mother is able to nominate a competent relative or friend as caretaker, that circumstance should be taken into account. *Ibid.* The mother in this case has been sentenced to prison for life, a circumstance which bears on her fitness because of her long unavailability. (In the case of second degree muder, she becomes eligible for parole in fifteen years. G. L. c. 127, § 133A, and c. 265, § 2.) In that sense she is, as the judge found, not capable of caring for Karla. The same could be said with respect to Tanika, as to whom the mother is not asked to relinquish parental connection. The mother has not asked for physical custody of her children but expressly cedes that function to the father. In terms of assisting

in decisions about her children's health and education, the mother is not without capacity.[3]

The trial judge's findings, while giving thoughtful attention to the child's needs, do not reflect sufficient consideration of the parents' (and particularly the father's) abilities to care for Karla. Consequently their current unfitness is not established by clear and convincing evidence. The decree allowing the petition to dispense with consent to adoption is vacated. This order does not require immediate termination of Karla's foster home placement or an immediate resumption of visitation between Karla and her natural parents. Further action may be tentative. Karla is now six and a half years old. The clinical picture which moved the agency to isolate her from her parents four years ago may have altered in a manner which strengthens or weakens the capacity of the biological parents to care for Karla.[4] The case is remanded to the Probate Court for further proceedings and for such orders as to physical custody and visitation as may be appropriate with a view toward whatever possibility may exist of ultimately returning legal custody of Karla to her mother and father and physical custody to the father. What further evidence is necessary is to be determined by the probate judge, although he will certainly wish to examine the current status of the father and of Karla. The judge is, of course, to consider the best general interests of the child but especially in regard to all feasible methods of any ultimate reunion of the child with her parents.

*So ordered.*

---

[3] To the extent that physical custody may remain with the foster mother, the natural mother's participation in decision making may be somewhat attenuated but is still appropriate.

[4] The petition in this case was filed July 21, 1981. The decree entered December 19, 1983. Various posttrial motions were filed, and the record was not assembled until January 9, 1985. The case was not fully briefed until mid-April. It was heard at the next sitting of this court.