## ADOPTION OF NICOLE.[1]

No. 95-P-1241.

Suffolk. January 3, 1996. - April 4, 1996.

Present: KASS, IRELAND, & LENK, JJ.

*Minor,* Adoption. *Parent and Child,* Dispensing with parent's consent to adoption. *Adoption,* Dispensing with parent's consent, Visitation rights. *Practice, Civil,* New trial.

The record of a hearing to dispense with a father's consent to adoption of his infant daughter supported the judge's conclusion that the father could not act as a fit parent, where the judge found that the father had no established relationship with the child, that the father would remain incarcerated in State prison until the child was three and one-half years old, that the father had a history of persistent criminal recidivism and alcoholism, and that the child's best interests were served by her remaining with the adoptive parents with whom the child had lived since she was five months old. [260-263]

In a proceeding to dispense with parental consent to adoption, the child welfare agency properly, in the circumstances, proceeded toward adoption rather than attempting to maintain a family unit, where the mother had surrendered the child for adoption and where the father, who was incarcerated, would not be available for some years. [263]

A Probate Court judge did not abuse her discretion in denying without a hearing a father's motion for a new trial or to amend findings in a proceeding to dispense with parental consent to adoption, where, on the materials submitted the judge could properly conclude that, in light of the extensive evidence at trial, there was insufficient change in circumstances to warrant an evidentiary hearing. [263-264]

In the circumstances of a proceeding to dispense with a father's consent to adoption, the judge properly in her discretion declined to incorporate visitation by the natural father in the judgment. [264-265]

PETITION filed in the Suffolk Division of the Probate and Family Court Department on March 30, 1993.

The case was heard by *Elaine M. Moriarty,* J., and a motion for a new trial was considered by her.

[1]A fictitious name.

*Katherine Triantafillou* for the father.

*Barbara D. Gilmore* for The Catholic Charitable Bureau of the Archdiocese of Boston, Inc.

*Sharon Feigenbaum* for the minor.

KASS, J. There are four arguments that the biological father presses in his appeal from a decree under G. L. c. 210, § 3, dispensing with his consent to the adoption of his daughter Nicole: 1) the Probate Court judge mistakenly equated his incarceration with parental unfitness; 2) the child welfare agency involved failed to make the effort required by statute to hold the biological family unit together; 3) the judge erroneously denied a motion for a new trial or to amend findings without an evidentiary hearing; and 4) the judge erroneously forbade postadoption visitation by the father. We affirm.

Prior to Nicole's birth on December 15, 1992, her mother had for many years abused alcohol. Unable to cope with her infant daughter, the mother placed Nicole when three days old in the custody of the Catholic Charitable Bureau of the Archdiocese of Boston, Inc. (CCB). At the time, the biological father was serving a sentence of from twelve to twenty years for armed robbery and assault with a dangerous weapon. He would first be eligible for parole in June, 1996. On March 11, 1993, — the child was then three months old — the mother surrendered Nicole to CCB for adoption. The baby at five months was placed in a pre-adoptive home and has resided there ever since.

The biological father, who was thirty-four years old at the time of trial, had been in and out of jail repeatedly for fourteen years. His adult convictions, in chronological order, included breaking and entering in the night, larceny, possession of burglarious tools, armed assault in a dwelling, unlawful possession of a firearm, burglary, drunk driving, malicious destruction of property (at a police station), armed robbery, and assault and battery with a dangerous weapon. Like the mother (to whom he was married), the father drank excessively and habitually. He claims to have stopped drinking in September, 1991, although he entered a plea of guilty to driving while under the influence of alcohol in February, 1992..

1. *Fitness of the father to act as a parent although incarcerated.* Section 3(c)(xiii) of c. 210 of the General Laws, inserted by St. 1992, c. 303, § 5, provides that when assessing the fitness of a parent, the judge shall consider "the conviction of a

parent . . . of a felony offense that the court finds is of such a nature that the child will be deprived of a stable home for a period of years; provided, however, that incarceration in and of itself shall not be grounds for termination of parental rights." The statutory language codifies what had been decided in *Petition of Boston Children's Servs. Assn. to Dispense with Consent to Adoption*, 20 Mass. App. Ct. 566, 573 (1985), namely that, compelled absence of a parent by reason of incarceration was to be taken into account but did not conclusively render a parent unfit. In that case, for example, a long term and stable parent and child relationship had been established between mother and children before the mother was convicted of second degree murder. Before starting to serve her sentence, the mother made arrangements for the care of her children by members of her immediate family.

By contrast, the father in the instant case had no established relationship with Nicole. In a sense, that was not his fault, as he was in prison when she was born and would be in prison for at least three and one-half more years from the date of her birth. Fault, however, is not the focus of the inquiry. The question is whether the father realistically can provide for the needs of the child: shelter, food, clothing, love, guidance, discipline, stimulation, education, comfort, and play. As a practical matter, the father could do none of those things during the child's earliest formative months of life. He was unable through family or close friends to set up a reliable child care structure. No one among his siblings was up to the task. The judge reasonably found that the friend he proposed as a caretaker showed no promise of ability, economic and emotional, to provide a stable environment — even if we accept as possible that some link could be forged between father and child through visits in prison during this early time in the child's life.

As to the likelihood that the father could become a stable physical and emotional presence in Nicole's life if he were paroled in two year's time from the date of the judge's findings of fact, the judge was warranted in factoring in whether it was plausible that the defendant was so altered that he would avoid a revocation of parole. Such reformation is possible and, indeed, is a goal of correctional institutions, but the judge, who was bound to consider the best interests of the child, was warranted in measuring probabilities rather than

possibilities. See, as to the prognostic relevance of past behavior, *Petition of Catholic Charitable Bureau to Dispense with Consent to Adoption*, 13 Mass. App. Ct. 936, 938 (1982); *Adoption of Abigail*, 23 Mass. App. Ct. 191, 196 (1986); *Adoption of George*, 27 Mass. App. Ct. 265, 268-269 (1989). The judge found that the father was realistic neither as to arrangements with others nor as to his physical availability.

We have not overlooked, nor did the Probate Court judge, that the father had managed to acquire some knowledge about child care and, indeed, displayed some sound intuition about whether the baby had been fed, changed, or whether she might have an ear ache. Once again, however, the central judgment does not concern the father's merits or demerits, but whether, in all the circumstances (including consideration of those merits or demerits), he has the capacity to act as a fit parent. As to that core question, the record and the judge's subsidiary findings concerning the father's then current imprisonment and history of persistent criminal recidivism and alcoholism support her ultimate finding that the father could not act as a fit parent for Nicole, at the time of trial or within any relevant future period. See *Bezio* v. *Patenaude*, 381 Mass. 563, 576-577 (1980); *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 391 Mass. 113, 119 (1984); *Adoption of Stuart*, 39 Mass. App. Ct. 380, 381-382 (1995).

Fitness to act as a parent, in statutory and decisional context, involves inquiry not only into the capacity of the biological parent but into the best interests of the child. See *Adoption of Carlos*, 413 Mass. 339, 348-349 (1992); *Petition of Boston Childrens' Serv. Assn. to Dispense with Consent to Adoption*, 20 Mass. App. Ct. at 567. In this case it is significant that since age five months, Nicole has been the daughter of her adoptive parents and knows them as mother and father. She has thrived there. The judge found that the child had formed strong, positive bonds with her adoptive parents and that she was at risk of serious psychological harm were she at age four or after — the earliest the biological father might be available — suddenly plucked from her home. G. L. c. 210, § 3(c)(vii). Compare *Petition of Dept. of Pub. Welfare to Dispense with Consent to Adoption*, 383 Mass. 573, 590 (1981); *Petition of Boston Children's Servs. Assn.*, 20 Mass. App. Ct. at 568. Although the bonding of a child with foster or adop-

tive parents is not a dispositive consideration, it is a factor that has weight in the ultimate balance. See *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 391 Mass. at 118-119.

2. *Adequacy of child welfare agency's effort to hold the biological family together.* The father protests that CCB failed in its duty to strengthen and encourage families by maintaining the family unit if possible. G. L. c. 119, § 1. 110 Code Mass. Regs. § 1.01 (1986).[2] *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption*, 383 Mass. at 585-586. *Adoption of Abigail*, 23 Mass. App. Ct. at 197. It is fair comment that CCB did not do much for the father, but it is equally fair comment that CCB had little with which to work. The mother had recognized her grievous incapacity and had opted out of the family unit. The father, for the reasons we have discussed, was not available and, in light of his own history of substance abuse and habitual criminal activity, was an extremely unpromising candidate to be a parent to Nicole. The best that the father proposed to do was to have the child cared for by strangers, in foster care, for what translated to an indefinite period of time. As to his prison status and his criminal history, the father had been less than forthcoming with CCB. On the particular facts, it was sensible for CCB, with the interest of the child in mind, to plan for adoption. *Adoption of George*, 27 Mass. App. Ct. at 269. Having charted a course of adoption, CCB was not bound to go through the motions of providing services geared toward father and daughter reunification. *Adoption of Adam*, 23 Mass. App. Ct. 922, 924-925 (1986). Parenthetically, we would not be "prepared to require dismissal of [CCB's] petition to the possible detriment of the child because of mistakes [CCB] may have made." *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption*, 383 Mass. at 586.

3. *Motion for a new trial.* After the judge had issued her findings and order for decree, the father timely moved for a new trial, to amend the findings, and to alter judgment. The father accompanied his motions with an affidavit that he had been transferred to North Eastern Correctional Center at Concord, where he had completed a parenting course, a program on anger management, and was participating in a

---

[2]See also 110 Code Mass. Regs. § 1:02(4), (5) & (6) (1986), and 102 Code Mass. Regs. § 4.06(3)(e) & (f) (1986).

substance abuse treatment program. The affidavit added that the father was learning new skills, had successful weekly visits with Nicole, continued to accrue the maximum good time credits, and that family members had come forward offering to care for the child.

The judge denied the motions without an evidentiary hearing. Quite rightly, she saw the situation as different from that which pertained in *Adoption of Theodore*, 36 Mass. App. Ct. 355, 357-358 (1994). There, the children in question had not yet been placed for adoption and the disabling factor for the mother was her inability to disassociate herself from an abusive husband. Free of his abuse, she had been found by the judge to be a capable and loving parent to her children. *Id.* at 356. At the time of the motion for a new trial, she had apparently divorced her husband and we thought the judge should hold an evidentiary hearing to determine whether the mother's situation had changed as markedly as set out in her motion.

*Adoption of Theodore* does not mandate an evidentiary hearing in every instance of a postjudgment motion in an adoption case. In the instant case, the child had been placed in an adoptive home. The father's situation, apart from his then current incarceration was one in which, as previously noted, recidivism and alcoholic relapse were necessary apprehensions. The judge might reasonably be skeptical that a member of the father's family, which had produced no acceptable caretaker before, had suddenly turned up. There was sufficient basis for the judge to conclude, as she did, that any change in circumstances was insufficient in light of the "totality of the extensive evidence" presented at trial. There was no abuse of the considerable discretion with which a judge is invested when acting on a motion for a new trial. *Hartmann* v. *Boston Herald-Traveler Corp.*, 323 Mass. 56, 60-61 (1948). *Maurer* v. *E.A. Gralia Constr. Co.*, 37 Mass. App. Ct. 403, 407 (1994).

4. *Visitation.* The Probate Court judge declined to order postadoption visitation. Such visitation may be incorporated into a plan of adoption, but whether, in any given case, it is wise is a matter left to the discretion of the judge who sat on the case. See *Petition of the Dept. of Social Services to Dispense with Consent to Adoption*, 392 Mass. 696, 702 (1984); *Adoption of Abigail*, 23 Mass. App. Ct. at 199-200. Here no father-

daughter relationship had yet been established. The child knew her adoptive father as "Daddy." The judge might reasonably think it best that the privacy of the adoption be paramount. See *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 384 Mass. 707, 714-715 (1981).

*Decree affirmed.*