NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case.  A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-642

ADOPTION OF EVELYN (and a companion case[1]).

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

On September 15, 2021, a judge of the Juvenile Court found the mother and the father unfit to parent their two children and adjudicated the children in need of care and protection.  The judge terminated the parental rights of the mother and the father, and granted custody of the children to the Department of Children and Families (DCF), after considering the requisite factors under G. L. c. 210, § 3 (c); finding factors (ii), (iv), (vii), (viii), (x), and (xii) to be applicable to both parents; and concluding that it was in each child's best interests to terminate the parental rights of both parents.  See G. L. c. 119, § 26; G. L. c. 210, § 3 (c).  Both the mother and the father appealed from the judge's findings pertaining to the mother, arguing that the finding of unfitness and the decree terminating the mother's parental rights were not supported by

---

[1] Adoption of Adam.  The children's names are pseudonyms.

clear and convincing evidence, violating the mother's due process.[2]  We affirm.

Background.  We summarize the judge's findings of fact,[3] reserving some facts for the discussion.

Evelyn was born in 2011, and Adam was born in 2013.  DCF first became involved with the care of these children in 2015, after two reports were filed pursuant to G. L. c. 119, § 51A (51A reports), alleging neglect of both children by the parents and sexual abuse of Evelyn by an unknown perpetrator. Additional 51A reports alleging neglect and physical abuse of the children by the parents were filed and investigated before October 6, 2017, when DCF filed the instant care and protection petition after receiving a 51A report alleging that the father struck the mother in the face in the presence of the children on October 5, 2017.[4]  Responding police noticed "a significant bruise on [the mother's] eye" and arrested the father at the

_____

[2] On appeal, the father does not challenge the finding that he is unfit or the decree terminating his parental rights.  Rather, he challenges the findings pertaining only to the mother, as his position at trial was that the children should be reunified with the mother; his position remains the same on appeal.
[3] The judge made 318 findings of fact and thirty-five conclusions of law that "are both specific and detailed, demonstrating, as we require, that close attention was given to the evidence." Adoption of Don, 435 Mass. 158, 165 (2001).
[4] The judge noted that the 51A reports are "not taken for the truth of the matter asserted, but merely to explain why DCF became involved, i.e., to set the stage."  See Custody of Michel, 28 Mass. App. Ct. 260, 267 (1990).

scene.  Four days later, at a temporary custody hearing, the mother's eye was still black.  On March 29, 2018, the parents stipulated to their unfitness and that the children were in need of care and protection, and DCF was awarded custody.

In support of its initial goal of reunification, DCF updated the mother's and the father's preexisting family action plans.[5]  More than one year after the children were removed, during a December 2018 meeting with a DCF supervisor, the mother demonstrated a lack of comprehension of why DCF had custody of the children, denying the domestic violence in her relationship with the father.  Immediately thereafter, the father had his meeting with the supervisor and became verbally aggressive, as he had on a prior occasion when he stated while in DCF's office "that if he was the same person he used to be, he'd shoot the place up."  In April 2018, DCF changed the children's goals to adoption based on the parents' lack of engagement in services, housing uncertainty, and the parents' decisions to move out of Massachusetts for a time while the children were in foster care.

---

[5] In summary, the action plans required the mother and the father to meet with DCF monthly; obtain stable housing; engage in mental health treatment; complete a medication and substance use evaluation; take an intimate partner abuse education program; abide by all court orders; remain substance free and provide screenings; abstain from domestic violence; complete a parenting plan and budget; abstain from all physical discipline; keep a parenting journal; and demonstrate a change in behavior. Additionally, the mother was to engage in domestic abuse counseling and come prepared to visits with the children.

Evelyn and Adam struggled in foster care after the 2017 removal.  However, since late 2020 and through the time of trial, while in their respective preadoptive homes, both children demonstrated an improvement in their health and behavior.

At trial, which commenced on April 29, 2021, the father testified using a video conferencing platform.  However, his limited testimony was vague and his answers often demonstrated an unwillingness to cooperate.  He eventually disconnected from the proceedings and intentionally did not make himself available at any subsequent date to complete his testimony.  The judge drew a negative inference from the father's abandonment of the trial, as well as from his unwillingness to engage in a process that could have reunified him with his children.

The mother did engage in the trial and provided extensive testimony punctuated by periods of crying and yelling that, the judge found, "went beyond the understandable level of upset of a trial, and show[ed the mother's] inability to regulate her emotions, and that her mental health struggles continue[d] to the present day."[6]  The mother testified to the domestic violence

_____

[6] The mother was diagnosed at age twelve with posttraumatic stress disorder (PTSD) and anxiety, and continued to experience symptoms of PTSD and anxiety, and panic attacks.  She receives Social Security benefits "because, as she described it, she has 'mental problems.'"

4

incident of October 5, 2017, in which the father hit her in the presence of the two children, but she minimized the incident by saying that "the children were in the back seat and they weren't paying attention." In fact, the judge found, "even to this date [the mother] does not see that [the father] hitting her in front of the children was a harmful event." The mother struggled to communicate a coherent timeline of her residences during the pendency of the care and protection case but was able to articulate that, at the time of trial, she resided with her mother and brother and pooled her money with theirs to spend $800 per month on marijuana for the group. The judge found that the mother was untruthful during the trial about her housing situations in an attempt to create the illusion that she had broken off her relationship with the father. In fact, the mother shared a phone plan with the father; the mother's videoconferencing platform account for virtual visits with the children featured the father's name; and the mother never filed for a divorce from the father despite saying she intended to.

Discussion. "To terminate parental rights to a child and to dispense with parental consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the child's best interests." Adoption of Jacques, 82 Mass. App.

5

Ct. 601, 606 (2012). See Adoption of Kimberly, 414 Mass. 526, 528-529 (1993); Care & Protection of Martha, 407 Mass. 319, 327 (1990). "Parental unfitness is determined by considering a parent's character, temperament, conduct, and capacity to provide for the child's particular needs, affections, and age." Care & Protection of Vick, 89 Mass. App. Ct. 704, 706 (2016). Essentially, parental unfitness "means 'grievous shortcomings or handicaps' that put the child's welfare 'much at hazard.'" Adoption of Katharine, 42 Mass. App. Ct. 25, 28 (1997), quoting Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption, 367 Mass. 631, 646 (1975). "A parent may be found unfit because of mental deficiencies, but only where it is shown that such 'deficiencies impaired [their] ability to protect and care for the children.'" Adoption of Chad, 94 Mass. App. Ct. 828, 838 (2019), quoting Adoption of Quentin, 424 Mass. 882, 888-889 (1997). "[T]he trial judge must make specific and detailed findings demonstrating that close attention has been given the evidence," Adoption of Leland, 65 Mass. App. Ct. 580, 583 (2006), and those findings "left undisturbed absent a showing that the findings were clearly erroneous." Care & Protection of Vieri, 92 Mass. App. Ct. 402, 404-405 (2017), quoting Care & Protection of Stephen, 401 Mass. 144, 151 (1987). "A finding is clearly erroneous when there is no evidence to support it, or when, 'although there is evidence

6

to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed'" (citation omitted). Custody of Eleanor, 414 Mass. 795, 799 (1993).

The mother asserts that she was deprived of due process of law when the judge relied on evidence of domestic violence that the mother claims was stale; evidence of marijuana use that the mother says had no nexus to her parenting; and the mother's mental health struggles, evidence of which, the mother says, was "wholly lacking." She also faults the judge for relying on the children's bonds with their preadoptive parents to conclude that termination was in the children's best interests. The father contends that the evidence of the mother's unfitness was not clear and convincing when one "properly consider[s] that the mother was a victim of, as opposed to a perpetrator of domestic violence."[7]

As set forth below, the Juvenile Court judge's decision was firmly rooted in subsidiary findings that were proved by a preponderance of the evidence and clearly and convincingly demonstrated that the mother was unfit, such that termination of

---

[7] We question whether the father has standing to raise issues on behalf of the mother. See Adoption of Paula, 420 Mass. 716, 723 n.8 (1995) ("We decline to address allegations of error raised by the father having relevance only to the fitness of the mother"). Our decision would remain the same even were we to consider the issue raised by the father.

her parental rights was in the children's best interests. There was no due process violation.

1. Domestic violence. The judge did not err in finding that the children were at risk from further exposure to domestic violence if reunited with the mother. The judge did not base her decision solely on the October 5, 2017 incident as the mother claims, although that could have been enough. See Adoption of Zak, 87 Mass. App. Ct. 540, 543 (2015). There was evidence that more than one year after the children were removed, a police officer arrested the father in response to a report from the mother that the father had punched her in the mouth, but that the mother refused to make a written statement. "Instances of such familial violence are compelling evidence for a finding of parental unfitness." Adoption of Talik, 92 Mass. App. Ct. 367, 374 (2017). The mother also told a social worker that "there was domestic violence in her prior relationship with the father of her older children, with broken bones."[8] See Adoption of Don, 435 Mass. 158, 166 (2001) ("Prior history . . . has prognostic value" [citation omitted]).

The October 5, 2017 incident was not stale where the mother engaged in some domestic violence counseling, especially in the months preceding trial, but then denied at trial that violence

_____

[8] The mother's older children are not involved in these proceedings.

occurred and expressed confusion as to why DCF advised domestic violence services. See Adoption of Xarissa, 99 Mass. App. Ct. 610, 619 (2021). Children have an "absolute right to be free from abuse or neglect." Care & Protection of Lillian, 445 Mass. 333, 340 (2005). Since "the proper focus of termination proceedings is the welfare of the child[ren]," Adoption of Gregory, 434 Mass. 117, 121 (2001), it does not matter whether the mother was a victim or a perpetrator; "[f]ault . . . is not the focus of the inquiry." Adoption of Nicole, 40 Mass. App. Ct. 259, 261 (1996). "It is well documented that witnessing domestic violence . . . has a profound impact on children" and causes "a distinctly grievous kind of harm," Custody of Vaughn, 422 Mass. 590, 595, 599 (1996), regardless of who inflicts it. Here, it was "the mother's consistent failure to address [that] issue[] [that] supported the judge's conclusion that her unfitness would continue indefinitely," because she would not be able to protect the children from the harmful effects of future exposure. Adoption of Xarissa, supra at 619.

The judge properly considered as part of the equation that the mother and the father had not permanently separated, and did not err in so finding. The couple frequently moved together in and out of Massachusetts during the time when DCF had custody of the children; the mother decided not to expand her living situation to create more space for the children; the mother

9

tried to mislead the judge about her contact with the father; and the mother failed to file for divorce. The mother's phone and videoconferencing platform accounts also featured the father's name even though the mother claimed she stopped sharing a phone plan with the father, and the mother told a DCF social worker that she (the mother) could see the father returning to her life once the mother had secured custody of the children. She even made a comment that she was worried about her recovery if she left the father.[9] Where the mother did not acquire the necessary insights regarding her abusive relationship with the children's father to ensure that the children would not be exposed to future domestic violence, there was no error in the trial judge's assessment. See Adoption of Ulrich, 94 Mass. App. Ct. 668, 677 (2019) (mere participation in services insufficient; there must be evidence of appreciable improvement in parent's ability to meet children's needs); Guardianship of Estelle, 70 Mass. App. Ct. 575, 579 (2007) ("judge who hears the evidence, observes the parties, and is most familiar with the circumstances remains in the best position to make the judgment").

2. Mental health. There was ample evidence to support the judge's conclusions regarding the mother's mental health. "[I]n the best position to evaluate all the evidence," Adoption of Hugo, 428 Mass. 219, 229 (1998), cert. denied, 526 U.S. 1034

_____

[9] Both parents had a "lengthy history of drug abuse."

10

(1999), the judge found that the mother's difficulty regulating her emotions during the trial evidenced a continuing struggle. The mother may disagree with the judge's characterizations of her behavior, but we give the judge's findings "substantial deference." Adoption of Lisette, 93 Mass. App. Ct. 284, 292 (2018).

In addition to the mother's presentation at trial, the judge considered that the mother "did not meaningfully engage in any services for the vast majority of the case," and therefore was not in compliance with her action plan, which was tailored to address mental health concerns. Finally, the judge considered that, in November of 2018, a police officer transported the mother to a hospital for evaluation after the mother told the officer that "she was 'always' suicidal and thinks about killing [the] Father." The record allows us to conclude that the judge's findings concerning the mother's mental health did not fall "outside the range of reasonable alternatives." L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).

There was sufficient evidence to connect the mother's mental health concerns with her ability to parent the children, one of whom was diagnosed with a behavioral disorder that DCF noticed the mother struggling to manage while interacting with both children. The mother also acknowledged hitting the

11

children, including in the face, after getting overwhelmed when they did not listen to her.  See Adoption of Luc, 484 Mass. 139, 146 (2020), quoting Adoption of Frederick, 405 Mass. 1, 9 (1989) (mental health relevant to extent it affects parent's "ability to deal with a child's special needs").  The other child, Evelyn, had special dietary needs, and while the mother acknowledged that Evelyn had "food issues," she had no realistic plan for meeting the children's special needs, and "[a]t no point . . . did it appear that she was near ready to resume full responsibility for her [children]."  Adoption of Paula, 420 Mass. 716, 730 (1995).  Where the children exhibited unsafe and aggressive behaviors in the past, the mother's inability to provide a stable and appropriate environment was particularly relevant to the fitness analysis.  See Petitions of the Dep't of Social Servs. to Dispense with Consent to Adoption, 399 Mass. 279, 289 (1987); Adoption of Oliver, 28 Mass. App. Ct. 620, 625-626 (1990) (parental unfitness established where child had special needs and parent has little or no understanding of those needs, or willingness or ability to meet them).  Taken with evidence that the children's behaviors drastically improved in the supportive and stable environments of their preadoptive homes, the judge had ample basis to conclude that the mother's untreated mental health challenges impeded her ability to provide for the

12

children's particular needs.  See Care & Protection of Vick, 89

Mass. App. Ct. at 708-709.[10]

3.  Marijuana use.  Next, the mother argues that the

evidence did not establish that her marijuana use was a concern,

and that a nexus between her marijuana use and her ability to

parent the children was never established.  We need not dwell on

this argument, because the judge did not rely on this factor in

the decision to terminate the mother's parental rights.

4.  Children's bonds with preadoptive parents.  Lastly, the

mother argues that the trial judge wrongly considered the

children's bonds with their preadoptive parents as a dispositive

factor, but that is not the case.  Instead, the judge considered

the bonding as one factor out of several when making the

required determinations.  The bonding was "not dispositive," but

was "a factor that ha[d] weight in the ultimate balance."

---

[10]Despite the moral overtones of the statutory term "unfit," the
judge's decision was not a moral judgment or a determination
that the mother and father do not love the child.  Here, the
judge specifically noted that the mother loves the children.
But the inquiry at issue is whether the parents' deficiencies or
limitations "place the child at serious risk of peril from
abuse, neglect, or other activity harmful to the child.
Adoption of Bianca, 91 Mass. App. Ct. 428, 432 n.2 (2017),
quoting Care & Protection of Bruce, 44 Mass. App. Ct. 758, 761
(1998).

13

Adoption of Daniel, 58 Mass. App. Ct. 195, 202-203 (2003),

quoting Adoption of Nicole, 40 Mass. App. Ct. at 262-263.

Decrees affirmed.

By the Court (Milkey, Walsh & Smyth, JJ.[11]),

*Joseph F. Stanton*

Clerk

Entered:  August 10, 2023.

---

[11] The panelists are listed in order of seniority.