NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-550

ADOPTION OF BRIANNA.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The mother appeals from a decree issued by a Juvenile Court judge finding her unfit to parent her daughter, Brianna, terminating the mother's parental rights, and approving the plan of the Department of Children and Families (department) for the adoption of Brianna by her foster parent. On appeal, the mother contends that (1) the finding of unfitness was not supported by clear and convincing evidence; (2) the termination of her parental rights was not in the child's best interests; (3) the department failed to make reasonable efforts to reunify the mother and child; (4) the judge abused her discretion in denying trial counsel's motion to continue the trial; and (5) the judge erred in restricting the mother's post termination visitation

---

[1] A pseudonym. We use the same pseudonym assigned to the child in an earlier case before this court. See Adoption of Brianna, 102 Mass. App. Ct. 1125 (2023).

and not ordering post adoption visitation.  Brianna also maintains that the judge ignored her expressed preference to live with her mother.

Background.  We summarize the relevant, mostly undisputed facts and procedural history as set forth in the judge's decision and as supported by the record, reserving certain details for later discussion.

A.  Factual background.  The mother has long suffered from mental illness and was herself involved with the department from the age of nine until the age of eighteen.[2]  Brianna was born on March 27, 2014.  When Brianna was one month old, a report was filed pursuant to G. L. c. 119, § 51A (51A) alleging parental neglect after a domestic violence incident between her mother and father.  The department investigated pursuant to G. L. c. 119, § 51B (51B), and determined that the mother was the victim of domestic violence by the father.  Allegations of neglect were supported against the father but not against the mother.  In July 2014, another 51A report was filed after the

_____

[2] The mother was hospitalized due to her mental illness for sixteen days when she was about ten years old and then hospitalized again for nearly three months when she was fifteen. Over the course of years, the mother has been diagnosed with mood disorder, psychotic disorder, bipolar disorder, generalized anxiety disorder, major depression, post traumatic stress disorder, borderline personality disorder, and schizo-affective disorder.  The mother has also experienced auditory and visual hallucinations, mania, depression, poor impulse control, and physically aggressive behaviors.

mother was arrested and charged with assault with a knife on the father.  The police arrested the mother, but due to her disruptive behavior at the police station, transported her to the hospital for a psychiatric evaluation.  That same month, the department was granted temporary custody of Brianna and placed her in a foster home because of ongoing concerns about domestic violence.

Brianna was reunited with her mother in November 2014, and in May 2015 another 51A report was filed alleging neglect of the child after the mother delayed seeking medical treatment for Brianna, who was one year old, when Brianna had difficulty breathing.  When the mother did take the child to the hospital, she left with her against medical advice before Brianna could be fully examined.[3]  The mother then disregarded a recommendation by the medical providers to return for a follow-up appointment, and she lost Brianna's prescription.  This resulted in the department's taking temporary custody of Brianna for a second time.

In April 2016, the department reunified Brianna with the mother.  Fourteen months later, however, the department filed a

---

[3] The mother stated that she did not want the hospital "to experiment" on her child.

petition for temporary custody of Brianna for the third time, based on its concerns about mother's mental health.[4]

In June of 2017, when police responded to a call of domestic violence involving the mother, she tried to hide from emergency medical responders who were trying to take her to the hospital and she attempted to strangle herself by wrapping an extension cord around her neck. When she arrived at the hospital for an evaluation, she assaulted several security officers, and it took as many as eight staff members to physically restrain her.

Although the mother was given conditional custody of Brianna in August 2017, custody was revoked less than one month later because the mother failed to comply with the conditions of the order. In September 2017, a 51A report was filed when the mother approached a department worker during a supervised visitation with Brianna, became agitated with the worker in front of Brianna, and used profanities. In investigating that allegation, the shelter where the mother and Brianna had recently resided told the department that the mother had not been taking her medications, her mental health was "out of

_____

[4] In November 2016, the mother was stopped when she attempted to leave a grocery store without paying for her items. When police responded to the supermarket, the mother refused to leave the store's bathroom for forty-five minutes. She bit a police officer who was attempting to talk her into coming out of the bathroom.

control," and she was abusive towards the staff. The staff at the shelter also noted that the mother left Brianna unclean and in a dirty stroller for long periods of time, had to be taken to shop for food, and created a fire hazard by barricading the back door of the residence to stop people from looking inside.

The department prepared action plans to assist the mother, but she was unwilling to fully comply with them; she refused mental health medication and told her social worker that she did not need it. In March 2018, during a supervised visit with Brianna, the mother confronted a social worker and screamed profanities in the child's presence. Attempts by the departmental staff to de-escalate the situation proved futile. The mother grabbed Brianna, who appeared frightened by her mother's behavior,[5] and took her out of the building. When security attempted to stop her, the mother kicked the social worker's car and windows, and the mother had to be physically restrained when police arrived.

The mother was hospitalized because of mental illness in January 2019 and again less than a month later. During a home visit by the social worker, the mother was unresponsive to the social worker's attempts to go over her service plan, making comments that were unrelated and disconnected to the

---

[5] Brianna was noticeably upset and crying.

5

conversation.[6]  The mother's mental health continued to decline and in October 2020, emergency medical services personnel were twice dispatched to the mother's home because of her paranoid thoughts.  She was psychiatrically hospitalized for eleven days starting October 23, 2020, during which she displayed disorganized thinking and paranoid thoughts, believing that her landlord and the hospital were conspiring against her.  In July 2022, the mother was charged with assaulting a parking garage attendant.  In October 2023, a few months before her trial, the mother arrived unannounced at the department's area office and confronted staff, shouting in a supervisor's face.  By the time of trial in December 2023, the mother's social worker reported that she was often manic and had difficulty remaining focused and on-topic when discussing her past.  The mother remained defensive and resistant to the therapist's feedback and remained unable to comprehend the gravity and responsibility of properly caring for a child.

B.  Procedural history.  A trial commenced in November 2019, but a mistrial was declared in January 2020.  A second trial concluded in September 2021, and the trial judge entered a

---

[6] For example, the mother told the social worker that she "was a slave for five years," she was starved, and that "[l]ife was either jail or institution."  The mother was unable to explain her comments and when asked if she was safe, the mother responded that "life is busy and I'll be going like a spring chicken."

decree finding the mother unfit and terminating parental rights. The mother appealed, and, in an unpublished opinion entered on July 5, 2023, a panel of this court vacated the decree of termination of mother's parental rights and remanded the case to the Juvenile Court.  See Adoption of Brianna, 102 Mass. App. Ct. 1125 (2023).  The mother was appointed counsel that same month and a pretrial conference was held on August 17, 2023.  The mother's counsel agreed to trial dates of December 4, 5, and 13, 2023, with discovery completion by November 1, 2023.  A two-day trial occurred on December 4 and 5, 2023.  At the time of this trial, Brianna was nine years old.  After making 173 findings of fact and forty-four conclusions of law, the judge concluded that the mother was unfit, that her unfitness was likely to continue into the indefinite future, and that termination of parental rights was in the child's best interest.  This appeal followed.

Discussion.  1.  Standard of review.  "To terminate parental rights to a child, the judge must find, by clear and convincing evidence, that the parent is unfit and that the child's 'best interests will be served by terminating the legal relation between parent and child.'"  Adoption of Luc, 484 Mass. 139, 144 (2020), quoting Adoption of Ilona, 459 Mass. 53, 59 (2011).  The department bears the burden of proof as to both unfitness and the child's best interests.  See Care & Protection of Erin, 443 Mass. 567, 571-572 (2005).  "While a decision of

7

unfitness must be supported by clear and convincing evidence, . . . a judge's findings will be disturbed only if they are clearly erroneous."  Adoption of Paula, 420 Mass. 716, 729 (1995).  "A finding is clearly erroneous when there is no evidence to support it, or when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed" (quotations and citation omitted).  Adoption of Rhona, 57 Mass. App. Ct. 479, 482 (2003).

2.  Termination of parental rights.  As noted, the termination of a parent's right to a child requires a two-step analysis, requiring clear and convincing evidence of parental unfitness and that termination of parental rights is in the child's best interests.  See Adoption of Luc, 484 Mass. at 144 (2020).  Parental unfitness, which requires careful consideration of the facts of any given case, is "determined by taking into consideration a parent's character, temperament, conduct, and capacity to provide for the child in the same context with the child's particular needs, affections, and age."  Adoption of Mary, 414 Mass. 705, 711 (1993).  "'[P]arental unfitness' means 'grievous shortcomings or handicaps' that put the child's welfare 'much at hazard.'"  Adoption of Jacob, 99 Mass. App. Ct. 258, 262 (2021), quoting Adoption of Katharine, 42 Mass. App. Ct. 25, 28 (1997).  The considerations of

8

unfitness and best interests "are not mutually exclusive, but rather reflect different degrees of emphasis on the same factors" (quotations and citations omitted).  Adoption of Garret, 92 Mass. App. Ct. 664, 671 (2018).

In deciding parental unfitness, the "central judgment does not concern the [parent's] merits or demerits, but whether, in all of the circumstances (including merits and demerits), he [or she] has the capacity to act as a fit parent."  Adoption of Rhona, 63 Mass. App. Ct. 117, 125 (2005), quoting Adoption of Nicole, 40 Mass. App. Ct. 259, 262 (1996).  Evidence of a parent's refusal to cooperate with the department, engage in counseling, or maintain department service plans is also relevant to the determination of unfitness.  See Adoption of Rhona, supra at 126.  The judge considered the evidence on this point, including that the mother displayed a lack of cooperation with the department and failed to consistently attend services that were part of her plan.  And, when the mother did engage in a parenting program, she was often disruptive and did not participate effectively in treatment.  Likewise, evidence of domestic violence is relevant because domestic violence "may imperil a child's physical safety and psychological development."  Adoption of Jacob, 99 Mass. App. Ct. 258, 262 (2021).  The judge's findings reflect her consideration of this evidence, as well.

It is apparent from the judge's findings, however, that the judge's determination of unfitness rested primarily on the mother's long history of untreated mental illness. Having a mental disorder is relevant to the determination of parental unfitness if "it affects the parents' capacity to assume parental responsibility, and ability to deal with a child's special needs." Adoption of Frederick, 405 Mass. 1, 9 (1989). A review of the record supports the conclusion that the mother's failure to engage in mental health counseling and take prescribed medication interfered with her ability to assume parental responsibilities for Brianna. Brianna had been removed from her mother's care on several occasions because of the mother's untreated mental health issues. The judge properly considered the multiple incidents in which the mother was unable to manage her emotions and stress because of her untreated mental health, and the impact it had upon Brianna, who witnessed it. The judge also considered the number of times in which the mother's untreated mental health resulted in neglect of Brianna. The judge was appropriately concerned for Brianna's safety when the mother's mental illness resulted in the mother's failure to timely and adequately respond to Brianna's health needs.

In concluding that mother was currently unfit, the judge carefully assessed the evidence of unfitness, which was not fleeting in nature but rather spanned the course of several

years.  On these facts, the findings of mother's unfitness and that mother's pattern of unstable behavior would place the child "at serious risk of peril" is justified.  See Adoption of Cadence, 81 Mass. App. Ct. 123, 131 (2012).  As recently as the trial in 2023, despite engaging in therapy, the mother's mental health was still poor.  The judge noted that the mother's trial testimony was "tangential, circuitous and nonresponsive," demonstrating "her ongoing struggles with mental health and inability to care for her daughter despite her affection for her."[7]  All of this evidence demonstrated the mother's continuing mental health struggles and, despite her care and affection for her daughter, the mother's unfitness was not temporary.

Nevertheless, the mother argues that the judge erred because, even considering her "perceived shortcomings" in the aggregate, they did not amount to clear and convincing evidence that her unfitness would remain so indefinitely.  The mother points to the fact that, despite her mental health challenges, by the time of the trial she had earned her high school diploma, obtained stable housing and employment, engaged in parenting and domestic violence classes, and had mostly positive visits with

---

[7] The judge specifically noted that during her trial testimony, the mother's speech was pressured, she needed constant redirection by counsel to answer a question, her responses were often tangential and nonresponsive, and she lacked insight into her mental illness.

11

Brianna. While the mother's accomplishments are not in dispute, and the judge acknowledged recent improvements by the mother in her written decision, there was ample evidence to support the judge's conclusion that the mother was unfit, that her unfitness was not temporary, and that termination was in Brianna's best interests.

3. Child's expressed preference. We are not persuaded by the argument of both the mother and the child that termination of the mother's parental rights was in error because the judge ignored the existence of the strong bond that existed between the two. In fact, the judge acknowledged the mutual affection between the mother and Brianna and acknowledged that during supervised visitation, Brianna was happy to see her mother.[8]

We agree with Brianna that a judge should consider the wishes of the child in making custodial determinations, and a child's wishes "are entitled to weight in custody proceedings." Care & Protection of Vick, 89 Mass. App. Ct. 704, 710 (2016), quoting Care & Protection of Georgette, 439 Mass. 28, 36 (2003). "The child's wishes, however, are neither decisive nor outcome dispositive, . . . and must be considered against the backdrop of the mother's unfitness." Care & Protection of Vick, supra.

---

[8] We also note that, when Brianna's visits with the mother were suspended, Brianna would ask for her mother and wanted to spend time with her.

Here, the judge recognized Brianna's preference to return to her mother but ultimately determined that the child's best interests would be served by termination of her mother's parental rights. Likewise, we recognize Brianna's sincere desire to be reunited with her mother despite her untreated mental illness, but we are also constrained from making a custody decision that would subject Briana to an unacceptable risk of harm and neglect.

In addition to Brianna's expressed preference, the judge also appropriately considered the academic, emotional, and social progress Brianna has made during the time she lived with her preadoptive family as compared to her deficits in these areas while in the mother's care. The judge could also consider the harm that Brianna would suffer if she lost the stable and secure living arrangement that she had lived in for six years as exemplified by Brianna's strong reaction to a temporary alternate placement in 2018. See Adoption of Rhona, 63 Mass. App. Ct. at 126-129. There is adequate support in the record that termination of the mother's rights was warranted, despite Brianna's expressed interest.

4. Reasonable efforts. "When a child is removed from his or her home and placed into the custody of the [department], the department is required by statute to make ongoing 'reasonable efforts to make it possible for the child to return safely to his [or her] parent or guardian.'" Care & Protection of Rashida,

13

488 Mass. 217, 218 (2021), quoting G. L. c. 119, § 29C.[9]  This general obligation requires the department "to 'encourage the use by [the mother] of all available resources' to promote the 'strengthening and encouragement of family life for the protection and care of [the] children.'"  Care & Protection of Elaine, 54 Mass. App. Ct. 266, 274 (2002), quoting G. L. c. 119, § 29C.  "A judge's determination that the department made reasonable efforts will not be reversed unless clearly erroneous.  Adoption of West, 97 Mass. App. Ct. 238, 242 (2020), citing Adoption of Ilona, 459 Mass. at 61-62.  However, even when a judge has found that the department has failed to make reasonable efforts, "a trial judge must still rule in the child's best interest."  Adoption of West, supra, quoting Adoption of Ilona, supra at 61.

Assuming that the claim of inadequate reasonable efforts was properly preserved, we discern no error in the judge's conclusion that the department made reasonable efforts toward reunification in this case.  The department repeatedly returned the child to the mother's custody and attempted to work with the mother to provide a safe home for the child in the mother's

_____

[9] In determining the fitness of a child's parent, the judge must consider the factors listed in G. L. c. 210, § 3 (c), some relating to whether the department provided reasonable services and whether the parent utilized said services.  See G. L. c. 210, § 3 (c).  See also Adoption of Gregory, 434 Mass. 117, 126 (2001).

14

care.  Moreover, the department recommended mental health counseling for the mother, but her participation and medication compliance was inconsistent, and she failed to recognize the need for such services.  Although the mother participated in a number of parenting groups, she was often unable to grasp the information or communicate what she learned in the group programs.  Similarly, although the mother engaged in individual therapy, she was unable to communicate the goals of that therapy.  We conclude that the judge could consider the mother's lack of consistent engagement in mental health counseling and medication compliance as well as her failure to meaningfully participate in or benefit from other services when determining whether the department's efforts, in the context of the entire case, were reasonable.

We are likewise unpersuaded by the mother's argument that the department's efforts were not reasonable where the department failed to comply with its own disability policy.  The mother argues that the department was keenly aware of the mother's long history of mental illness and her failure to consistently engage in counseling and take prescribed medication yet, despite this knowledge, offered nothing more than an action plan including generic mental health counseling and medication compliance.  While the mother does not identify the specific service that should have been provided, she argues that had the

department done something more, it was possible that the judge would not have found that mother's unfitness was likely to continue for the indefinite future.

The evidence does not support this contention. While the mother places significant weight on the failure of the department to comply with its 2022 disability policy, we note that much of the evidence of parental unfitness started in 2014 and occurred mostly during a time when the department did not have such a policy. Furthermore, the mother failed to comply with most of the recommendations in the service plans the department did provide and was uncooperative and refused to comply with the specific mental health recommendations. Where the mother was oppositional and combative to the department's attempts to provide her with services, the record provides abundant evidence that, even if the department complied with its 2022 disability policy, the mother would not have engaged in meaningful treatment. As such, any deficiency in the services offered by the department did not affect that ultimate determination of indefinite unfitness.[10]

---

[10] We note that the department provided the mother with an individual therapist and a psychiatrist, and the providers made a coordinated effort to encourage the mother to engage in mental health counseling and to take her prescribed mental health medication. Despite these services, the mother's compliance with medication and treatment was inconsistent at best, and her mental health had not shown significant improvement by the time of the trial at issue here.

In sum, after reviewing the entire record, we are satisfied that the judge's comprehensive determination that the mother was unfit to parent the child, that her unfitness was not temporary, and that the department had made reasonable efforts towards reunification was supported by clear and convincing evidence.

4. Motion to continue. The mother claims that the judge's denial of her motion to continue the trial amounted to an abuse of discretion. "Whether to continue any judicial proceeding is a matter entrusted to the sound discretion of the judge, and [the] decision will be upheld absent an abuse of that discretion." Adoption of Ursa, 103 Mass. App. Ct. 558, 568 (2023), quoting Care & Protection of Quinn, 54 Mass. App. Ct. 117, 120 (2002). Based on the facts presented in this case, we cannot say that the judge abused her discretion. Trial counsel was appointed for the mother on July 27, 2023, and the judge set a discovery compliance date of November 1, 2023, with trial to begin on December 4, 2023. On November 17, 2023, the mother's counsel filed an unopposed motion to continue the trial for one month so that she could have more time prepare for trial; specifically, the mother's counsel sought additional time to respond to the discovery the department provided on November 8, 2023, after the discovery deadline had passed. On appeal, the mother claims that the denial of her motion to continue amounted to an abuse of discretion because her counsel was unprepared to

17

go to trial without an updated evaluation of the family and without recent court investigation reports, family assessments or foster reviews. She has not established, however, that the thirty-day continuance trial counsel asked for would have been sufficient to enable the mother to obtain completed reports. Given all the facts in this case, including the lengthy procedural history, we cannot conclude that the judge abused her discretion in the denial of the motion. See Care & Protection of Quinn, 54 Mass. App. Ct. at 120.

5. Posttermination and postadoption visits. At the time of trial in 2022, the mother and Brianna had monthly visits. After trial, the judge ordered that the mother be given no less than two posttermination visits with Brianna per year. The mother contends that the judge abused her discretion by significantly reducing the amount of contact with Brianna after the termination of her parental rights compared to the amount of contact she had with Brianna prior to the termination of her parental rights. While we are sympathetic to the mother's concern about reduced contact with Brianna, the reduction in visitation is consistent with the differing purposes of pretermination contact versus posttermination contact and does not, without more, amount to an abuse of discretion. See Adoption of Vito, 431 Mass. 550, 564-565 (2000).

18

As to postadoption visitation, the judge credited the testimony of the preadoptive mother who believed that Brianna would benefit from continued contact with the mother and that she would allow this to occur and did not enter a specific order requiring postadoption visitation. The decision whether to require postadoption visits is left to the judge's discretion. See Adoption of John, 53 Mass. App. Ct. 431, 439 (2001). "When a trial judge decides not to order visitation, . . . [s]he is not required to make extensive findings if [s]he has already made specific and detailed findings regarding the child's best interests and the determination of parental unfitness." Id.

Here, the judge's decision not to order visitation does not amount to an abuse of discretion. A judge does not abuse her "discretion in leaving the issue of visitation to the sound judgment of [a] loving adoptive parent[] who will be in the best position to gauge whether such visits continue to serve" the best interests of Brianna, "rather than issuing a specific visitation order setting forth the frequency and extent of such visits." Adoption of Ilona, 459 Mass. at 66. The judge took note of the preadoptive mother's position that the best interests of the child would be served by continued visitation between the mother and child, and the judge was not required to order visitation. Id. Here, given the long and positive relationship that the child had with her preadoptive mother, we

19

discern no abuse of discretion in the judge's decision to leave the manner and frequency of the postadoption contact to the judgment of the preadoptive mother.

Decree affirmed.

By the Court (Ditkoff, Hand & Walsh, JJ.[11]),

Paul Little

Clerk

Entered: April 1, 2025.

---

[11] The panelists are listed in order of seniority.